UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF COLORADO

IN RE:                                          )
                                                )
ACCENT WINDOWS, INC.,                           )   Case No. 11-14348- SBB
EIN #84-1292301                                 )   Chapter 11
                                                )
      Debtor.                                   )
                                                )

**MOTION TO APPROVE INTERIM ORDER (I) AUTHORIZING DEBTOR TO OBTAIN POSTPETITION SECURED FINANCING; (II) AUTHORIZING THE DEBTOR'S USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION LENDER PURSUANT TO 11 U.S.C. §§ 361, 362, AND 363; (IV) MODIFYING THE AUTOMATIC STAY; AND (V) SCHEDULING FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001**

Debtor, Accent Windows, Inc. ("Accent" or "Debtor"), by and through its counsel, Kutner Miller Brinen, P.C., hereby requests entry of an interim order and a final order authorizing the Debtor to obtain postpetition secured financing, authorizing the Debtor's use of cash collateral, granting adequate protection to the Debtor's prepetition lender, modifying the automatic stay, and scheduling a final hearing pursuant to Bankruptcy Rule 4001 the ("**Interim Order**").  In support, the Debtor states as follows:

## BACKGROUND

A. *The Debtor*

1.      The Debtor filed for relief under Chapter 11 of the Bankruptcy Code on March 4, 2011.  The Debtor is continuing to operate its business as Debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No creditors' committee has been appointed in the Chapter 11 Case.

2.      This is the Debtor's second Chapter 11 bankruptcy case.  The Debtor previously filed for relief under Chapter 11 of the Bankruptcy Code on November 4, 2008, and its plan of reorganization was confirmed on September 9, 2009.

3.      The Debtor custom manufactures energy efficient vinyl replacement windows and patio doors in its Westminster, Colorado facility, and sells those windows and doors throughout the Front Range area.

B. *Pre-Petition Indebtedness*

4.      The Debtor is obligated on outstanding Promissory Note dated February 25, 2011 (the "**Prepetition Loan**"), in the original principal amount of Fifteen Thousand and no/100 Dollars ($15,000.00) issued to P.H. Tech, Inc. (the "**Prepetition Lender**"). The obligation of the Debtor under the Note is secured by all assets of the Debtor, pursuant to a Security Agreement dated as of February 25, 2011, and UCC filing with the Colorado Secretary of State, Reception No. 20112009696, on February 28, 2011. The Prepetition Loan was made to the Debtor by the Prepetition Lender to provide retainers to the Debtor's professionals in connection with this bankruptcy filing.

5.      The Debtor filed for relief under Chapter 11 in order to sell its business as a going concern as expeditiously as possible. Toward that end, the Debtor will request that the Court establish an auction sale procedure through which the Debtor will solicit bids for its assets and an auction sale will be conducted. The Prepetition Lender has made an offer to the Debtor for those assets, and it is anticipated that the Prepetition Lender will serve as the stalking horse bidder in the sale.

C. *Postpetition Secured Financing*

6.      In order to maintain its operations pending a sale of its assets, the Debtor is in need of funds with which to assist in meeting its ongoing operating expenses and the costs of the Chapter 11 Case in accordance with the Budget (as defined below). The Debtor is also in need of funds to provide adequate protection to the Prepetition Lender.

7.      The Debtor lacks the cash flow necessary to survive as an ongoing concern without financial assistance. The Debtor has no source of income other than through the sale of its windows and doors, but such income is insufficient to enable the Debtor to pay its basic overhead expenses.

8.      Prepetition Lender has agreed to provide the Debtor with postpetition financing in the form of a line of credit up to $78,750 on an interim basis and $135,000.00 on a final basis in aggregate principal amount of postpetition financing (the "**DIP Facility**") and the loan under such facility (the "**DIP Loan**") on the terms set forth in the Loan Agreement attached hereto as **Exhibit 1** (the "**Loan Agreement**"). The DIP Facility and DIP Loan will be used by the Debtor to meet its post-petition operating expenses and costs associated with the case. The Prepetition Lender is not affiliated with the Debtor.

9.     The Prepetition Lender is one of the Debtor's secured creditors, and anticipates being the stalking horse in the Debtor's proposed bidding and auction procedures.

10.     If the Debtor does not obtain authorization to borrow under the DIP Facility Documents and the DIP Facility is not approved, the Debtor will suffer immediate and irreparable harm.  The Debtor believes the terms of the proposed loan are reasonable and the Debtor does not believe it can obtain a loan with better terms at this time.  The Debtor has sought out other sources of financing but has not been successful in finding any party willing to extend it credit.

11.     The Debtor is unable to obtain adequate unsecured credit allowable as an administrative expense under Bankruptcy Code section 503, or other financing under Bankruptcy Code sections 364(c) or (d), on equal or more favorable terms than those set forth in the DIP Facility Documents based on the totality of the circumstances.  Moreover, a loan facility in the amount provided by the DIP Facility is not available to the Debtor without granting the DIP Lender superpriority claims, senior liens, and security interests, pursuant to Bankruptcy Code sections 364(c)(1), (2), (3) and 364(d), as provided in the DIP Facility Documents.

12.     The proposed loan will have the terms set forth in the Loan Agreement which are generally set forth as follows: a) Borrowing facility up to $135,000. **Loan Agreement, P.3, ¶2**; b) Interest rate of the Wall Street Journal Prime Rate plus 3% per annum (the current Wall Street Journal Prime Rate is 3.25%).  **Loan Agreement, P.2, ¶1.8;** c) Administrative expense priority pursuant to §364. **Interim Order, P.11, ¶13;** d) secured by a first and prior lien on all assets of the Debtor, except Prepetition Lender shall hold a junior lien in  a Besten 84" 5 Pair Press, subject to a senior security interest held therein by Truseal Technologies, Inc.. **Loan Agreement, P.3, ¶4;** e) Debtor must reach an agreement for procedures with respect to the sale of all or substantially all of the Debtor's assets pursuant to an asset purchase agreement. **Loan Agreement, P. 4, ¶5.3;** f) Debtor and Prepetition Lender must reach an agreement on an Operating Budget. **Loan Agreement, P. 4, ¶5.5;** g) Debtor must keep its assets properly insured. **Loan Agreement, P. 4, ¶5.7;** h) on each Wednesday during the term of the Loan Agreement, Debtor must provide a line-by-line variance report for the preceding week and on a cumulative basis comparing actual receipts and disbursements to amounts projected in the Operating Budget. **Loan Agreement, PP. 7-8, ¶7.8.1;** i) all outstanding interest and principal will be due at the earlier of the closing on the sale of the Debtor's assets, or April 29, 2011. **Loan Agreement, P.**

**3, ¶3**; j) Debtor must pay all post-petition taxes. **Loan Agreement, P. 8, ¶7.9; and** k) upon occurrence of an Event of Default, or the occurrence of a Termination Date, as defined in the Interim Order, Prepetition Lender can seek relief from the automatic stay upon hearing and five business days prior notice, and if relief is granted, it will be entitled to foreclose or otherwise enforce its security interests. **Interim Order, P.16, ¶24(a).**

13.     Approval of the DIP Loan is in the best interest of the Debtor, its creditors and the estate as it will allow the Debtor to maintain its ongoing business operations, and provide the Debtor with an opportunity to sell its assets as a going concern that maximizes the distribution to creditors. The Debtor believes that the proposed loan is reasonable and will assist in preserving and enhancing the Debtor's going concern value.

D.   _Use of Cash Collateral and Adequate Protection_

14.     In order to pay necessary ongoing operating expenses, the Debtor must immediately use Cash Collateral in which Prepetition Lender has an interest. Without the use of cash collateral, the Debtor will not be able to pay employees, rent, suppliers, and other costs associated with goods sold. The Debtor proposes to use cash collateral on an interim basis until such time as the Court schedules a final hearing on the use of cash collateral. On an interim basis over the next 30 days and on a three month basis, the Debtor has prepared a budget setting forth its expected revenues and cash use. A copy of the budget is attached hereto and incorporated herein as **Exhibit 2** ("Budget"). The Debtor proposes to meet the Budget subject to the ability to deviate from the Budget by up to 5% per line item, per month. The Debtor's access to sufficient working capital and liquidity through the use of Cash Collateral is vital to the preservation and maintenance of the going concern value of the Debtor's estate so that the Debtor can maximize the value of its estate. Consequently, without the continued use of Cash Collateral the Debtor and its estate would suffer immediate and irreparable harm.

15.     The Budget reflects a conservative analysis of the Debtor's income and expenses over the projected periods.

16.     In order to provide adequate protection for the Debtor's use of cash collateral to the Secured Creditors, to the extent the Secured Creditors are properly perfected, the Debtor proposes the following:

            (a) replacement first priority security interests in and liens and mortgages
                (collectively, the "**Adequate Protection Liens**") on all of the assets (tangible,

intangible, real, personal or mixed) of the Debtor, whether now owned or hereafter acquired, including, without limitation, accounts, documents, inventory, equipment, capital stock in subsidiaries, investment property, instruments, chattel paper, commercial tort claims, cash, cash equivalents, securities accounts, deposit accounts, commodity accounts, real estate, leasehold interests, contracts, patents, copyrights, trademarks, causes of action, and other general intangibles, and all products and proceeds thereof (collectively, the "**Post-Petition Collateral**") subject only to the senior liens to be granted to the DIP Lender pursuant to the DIP Facility, and the lien of Truseal Technologies, Inc. in equipment generally described as a Besten 84" 5 Pair Press (the "**Truseal Lien**") **Loan Agreement, P. 3, ¶4**; and

(b) a superpriority administrative expense claim under section 507(b) of the Bankruptcy Code (the "**Adequate Protection Priority Claim**"), which Adequate Protection Priority Claim shall be senior in priority to any and all claims under sections 503(b) and 507(b) of the Bankruptcy Code, except the priority claims granted to the DIP Lender pursuant to the DIP Facility. **Interim Order, PP. 11-12 ¶13**;

(c) the Adequate Protection Liens and Adequate Protection Priority Claims shall secure the payment of the Prepetition Loan in an amount equal to any and all diminution in the value of the Prepetition Lender's interests in the Prepetition Collateral from and after the Petition Date (the "**Adequate Protection Obligations**") including, without limitation, any such diminution resulting from any of the following: (i) the use by the Debtor of the Prepetition Collateral, including, without limitation, the Cash Collateral, and (ii) the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code.   **Interim Order, P.6 ¶H ii.**

(d) The Adequate Protection Liens shall be subject to the Carve-Out and senior to any other liens on the Post-Petition Collateral except the liens securing the DIP Facility and the Truseal Lien. **Interim Order, P. 10 ¶7.**

(e) On a weekly basis, beginning with the week beginning March 5, 2011, the aggregate actual disbursements specified in the Budget during each such week

must be no greater than 105% of the aggregate projected disbursements for such period.  If necessary, but not later than two weeks prior to the expiration of the initial Approved Budget Period, the Borrower shall provide to the DIP Lender an updated Operating Budget for any additional period required to effectuate the sale of all or substantially all of the Debtor's assets, in substantially the same format as the previous budget, which upon acceptance by the DIP Lender, shall become the Approved Budget; provided, however, that a new Operating Budget may be effectuated at any time with the consent of the DIP Lender. **Interim Order, PP. 8-9 ¶4.**

(f) In the event the Borrower and the DIP Lender fail to agree upon a new Operating Budget by the end of the then-current Approved Budget, the DIP Facility will terminate upon the expiration of the last Approved Budget. **Interim Order, P. 9 ¶4.**

(g) The Debtor shall provide to the DIP Lender and the Prepetition Lender so as actually to be received on or before 12:00 noon (Eastern time) of each Friday, a weekly line-by-line variance report for the preceding week ending on Saturday, and on a cumulative basis for the period from March 5, 2011 to the last day of such preceding weekly period, which variance reports shall be in form and substance reasonably acceptable to the DIP Lender and the Prepetition Lender comparing actual cash disbursements to amounts projected in the Approved Budget.  Failure by the Debtor to comply with the Operating Budget shall constitute a Termination Event (as defined below).  The Operating Budget shall not be modified or otherwise amended without the written consent of the Prepetition Lender and the DIP Lender. **Interim Order, P.9 ¶5.**

(h) Upon the Termination Date, and after obtaining relief from this Court from the automatic stay upon hearing and five (5) business days prior notice to respective counsel to the Debtor, Committee, if any, Prepetition Lender, and U.S. Trustee, the DIP Lender shall be entitled to foreclose or otherwise enforce its security interests in and liens on any or all of the Postpetition Collateral and/or to exercise any other default-related remedies under the DIP Facility

6

Documents, or applicable law in seeking to recover payment of the DIP Obligations. **Interim Order, P.16 ¶24(a).**

(i) In addition to the Debtor's rights to seek authorization to use the Cash Collateral and/or Postpetition Collateral of the DIP Lender and Prepetition Lender and on a non-consensual basis on and after the Termination Date upon notice and hearing, and the reservation of all rights of the DIP Lender and Prepetition Lender to object to, and contest, such authorization as described above, the parties acknowledge and agree that (x) the only other issue to be determined and decided at such Court hearing is whether the Termination Date has occurred and is continuing and (y) if the DIP Lender is granted such relief from the automatic stay, then the Prepetition Lender will likewise be granted such relief at such time. **Interim Order, P.16 ¶24(a).**

(j) As used in the Interim Order, the term "**Termination Date**" means the earliest date on which any of the following events:

    i. the date on which the Debtor files a motion with the Bankruptcy Court for authority to proceed with the sale or liquidation of the Borrower (or any material portion of the assets of a Borrower) without the consent of the DIP Lender, and

    ii. the acceleration of the Loan or termination of the commitments under the DIP Facility, including, without limitation, as a result of the occurrence of an Event of Default (as defined below). **Interim Order, P.16 ¶24(b).**

(k) As used in the Interim Order, the term "**Event of Default**" means:

    i. The Borrower shall fail to make any payment of principal, interest, fees, or other amounts under the DIP Facility when the same becomes due and payable; or

    ii. Any representation or warranty made by the Borrower in the Loan Agreement, the Interim Order or the Final Order, any DIP Facility Document or that is contained in any certificate, document or financial or other statement furnished by it at any time under or in connection with the Loan Agreement or any

7

such other DIP Facility Documents shall prove to have been inaccurate in any material respect on or as of the date made or deemed made or furnished; or

iii. The Debtor shall breach or violate any term, covenant or agreement contained herein, the Interim Order or the Final Order; or

iv. Conversion of the Borrower's Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code; or

v. The appointment of a trustee in the Borrower's Chapter 11 Case without the consent of the DIP Lender; or

vi. The dismissal of Borrower's Chapter 11 Case; or

vii. The entry of any order modifying, reversing, revoking, staying, rescinding, vacating or amending the Interim Order or the Final Order without the consent of the DIP Lender; or

viii. The Interim Order shall not have been replaced by a Final Order acceptable to the DIP Lender in its sole discretion within twenty-five (25) days of the entry of the Interim Order; or

ix. The Borrower shall have proposed Sale Procedures, as defined in the Loan Agreement, not approved by the DIP Lender; or

x. The Borrower shall attempt to vacate or modify the Interim Order or the Final Order over the objection of the DIP Lender; or

xi. The Bankruptcy Court shall enter an order granting relief from the automatic stay to the holder or holders of any other security interest or lien (other than the DIP Lender) in any Postpetition Collateral to permit the pursuit of any judicial or non-judicial transfer or other remedy against any of the Postpetition Collateral; or

xii. Any provision of the documents relating to the Postpetition Loan shall cease to be valid and binding on the Borrower, or the Borrower shall so assert in any pleading filed in any court; or

8

xiii.  The Debtor shall (i) bring or consent to any motion or application in the Chapter 11 Case to obtain financing from any person other than the DIP Lender under section 364 of the Bankruptcy Code (other than with respect to a financing used, in whole or part, to repay in full in cash all obligations due under the DIP Facility); (ii) grant any lien that is *pari passu* or senior to any lien granted to the DIP Lender under the Interim Order or Final Order, except as permitted therein; or (iii) grant a superpriority claim, other than that granted in the Interim Order or Final Order (and other than with respect to the Carve-Out or adequate protection provided to the Prepetition Lender), which is *pari passu* with or senior to any of the claims of the DIP Lender against the Borrower hereunder; or

xiv.  Any other party shall seek and obtain allowance of any order in the Chapter 11 Case to recover from any portions of the Postpetition Collateral any costs or expenses of preserving or disposing of such Postpetition Collateral under section 506(c) of the Bankruptcy Code; or

xv.  There shall occur a variance from the Approved Budget in excess of approved variances, unless waived by the DIP Lender; or

xvi.  The Borrower shall fail to provide an Budget that is acceptable to DIP Lender in accordance with the terms set forth herein, the Interim Order or the Final Order; or

xvii.  Either Borrower or the DIP Lender shall terminate the Asset Purchase Agreement between them; or

xviii.  The Bankruptcy Court approves the sale of substantially all of the assets of the Borrower to someone other than the DIP Lender or an affiliate of the DIP Lender. **Interim Order, PP.17-19 ¶24(c).**

(l) Upon the occurrence of a Termination Event, to the extent unencumbered funds are not available to pay in full administrative expenses, the Adequate Protection Claims, the Adequate Protection Liens and the liens securing the Prepetition Loan and the DIP Facility, repayment to the DIP Lender shall be subject to (i) the payment of (a) unpaid professional fees and expenses specified in the Operating Budget that have been incurred as of the date of such Termination Event by professionals retained by the Debtor, any official committee of unsecured creditors (the "**Committee**"), any other statutory committee, trustee, examiner or other representative appointed in the Chapter 11 Case (collectively, the "**Professionals**") net of any unused retainers for such professional fees and expenses, (the "**Professional Fee Carve-Out**"), and (ii) the payment of fees payable pursuant to 28 U.S.C. § 1930 (together with the Professional Fee Carve-Out, the "**Carve-Out**").  Estate professional fees and expenses may be paid only to the extent they are allowed, or as otherwise permitted pursuant to the compensation procedures approved by the Bankruptcy Court. **Interim Order, PP. 19-20 ¶26.**

(m) No portion of the Postpetition Collateral, Prepetition Collateral, the Cash Collateral, or the Carve-Out, and no disbursements set forth in the Budget, shall be used for the payment of professional fees, disbursements, costs or expenses incurred in connection with asserting any claims or causes of action against the Prepetition Lender, including, without limitation, any action challenging or raising any defenses to the Prepetition Loan, or the liens of the Prepetition Lender. **Interim Order, P.20 ¶27.**

17.   The proposed Order granting the relief sought herein does not contain any provisions set forth in L.B.R. 4001-3App.

WHEREFORE, the Debtor respectfully requests that the Court enter an Interim Order, a proposed form is filed herewith, authorizing the Debtor to obtain postpetition secured financing, authorizing the Debtor's use of cash collateral, granting adequate protection to the Debtor's prepetition lender, modifying the automatic stay, and scheduling a final hearing pursuant to Bankruptcy Rule 4001, and for such additional relief as to the Court appears proper.

DATED: March 7, 2011

Respectfully submitted,

By: _Jeffry Brinen_

Jeffrey S. Brinen, #20565
Kutner Miller Brinen, P.C.
303 E. 17th Avenue, Suite 500
Denver, CO 80203
Telephone: (303) 832-2400
Telecopy: (303) 832-1510
E-Mail: jsb@kutnerlaw.com

## CERTIFICATE OF SERVICE

The undersigned certifies that on March 7, 2011, a copy of the foregoing **MOTION and NOTICE OF MOTION TO APPROVE INTERIM ORDER (I) AUTHORIZING DEBTOR TO OBTAIN POSTPETITION SECURED FINANCING; (II) AUTHORIZING THE DEBTOR'S USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION LENDER PURSUANT TO 11 U.S.C. §§ 361, 362, AND 363; (IV) MODIFYING THE AUTOMATIC STAY; AND (V) SCHEDULING FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001** was mailed **VIA FEDERAL EXPRESS OVERNIGHT** in accordance with FED. R. BANKR. P. 2002 and 11 U.S.C. § 342(c) interested parties at the following addresses:

US Trustee
999 18th St
Suite 1551
Denver, CO 80202
*Also via E-mail*

Chase
2371 W 128th Ave
Westminster, CO 80234

Pecos 20, LLC
c/o Basham & Associates
1499 Blake, #1F
Denver, CO 80202

Market Place at Journal Center
Excalibur Asset Management
2301 San Pedro Drive, NE
Albuquerque, NM 87110

PH Tech Corp
144 Ferry Street
Buncher Industrial Park
Leetsdale, PA 15056
Attn: Serge Falardeau

Norm Meier
435 Garfield Street
Denver, CO 80206

Pecos, LLD
c/o Basham & Associates
1499 Blake, #1F
Denver, CO 80202

G&D, LLC
8390 E. Crescent Park, #300
Greenwood Village, CO 80111

Idearc Media Corp., #1223
2200 W Airfield Drive
DFW Airport, TX 75261
Attn: Accounts Receivable

John J. Appelhanz
5960 Monaco Street
Commerce City, CO 80022

Comcast Spotlight
1899 Wyncoop Street, #400
Denver, CO 80202

Customgas Solutions
1750 East club Blvd
Durham, NC 27704

Dex Media East #6252
9501 E Panorama Circle
Englewood, CO 80112

US Building Supply
4391 York Street
Denver, CO 80216
Attn: Cheryl

US Bank
824 North 11th Street
St. Louis, MO 63101-1016

Airgas Intermountain, Inc.
4810 Vasquez Blvd
Denver, CO 80216

BKD, LLP
1700 Lincoln Street
Suite 1400
Denver, CO 80203-4514

KCNC TV
21249 Network Place
Chicago, IL 60673-1249

Minor & Brown, PC
Cherry Creek Plaza, #1100
650 South Cherry Street
Denver, CO 80246
Attn: Tony King

Yellow Book – West
c/o Clovis & Roche, Inc.
4401 N I-10 Service Road West
Suite 200
Metairie, LA 70006

Xcel Energy
414 Nicollet Mall
Minneapolis, MN 55401-1993

PRC-DESOTO International, Inc.
2750 114th Street, #400
Grand Prairie, TX 75050

Glass, Inc.
4005 South Clay Street
Englewood, CO 80110-4373
Attn: Tim Litterest

Edgetech IG, Inc
800 Cochran Ave
Cambridge, OH 43725
Attn: Melissa King

*s/ Angela R. Upton*
Angela R. Upton

## LOAN AGREEMENT

**THIS LOAN AGREEMENT** (this "**Agreement**") is made and entered into as of March 4, 2011 (the "**Effective Date**") by and between **ACCENT WINDOWS, INC.**. (the "**Borrower**") and **P.H. TECH, INC.** (the "**Lender**").

### RECITALS

A.     The Borrower filed a petition under Chapter 11 of the Bankruptcy Code on March 4, 2011 Bankruptcy Case No. 11-14348-SBB, pending in the United States Bankruptcy Court for the District of Colorado.

B.     The Lender has agreed to provide debtor in possession financing to the Borrower on the terms and conditions set forth herein.

### AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants contained herein and the loan to be made hereunder, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Lender and Borrower hereby covenant and agree as follows:

1.     Unless the context otherwise requires and except as otherwise may be provided herein: (i) definitions contained in the Code (herein defined) shall apply to terms, words and phrases used herein, except that in case of any conflict between such definitions and definitions contained in Article 9 of the Code, the Article 9 definitions shall apply; (ii) the singular shall be deemed to include the plural and the plural shall be deemed to include the singular; and (iii) the terms as used herein shall be construed and controlled by the following definitions:

1.1     APA.  "APA" means that Asset Purchase Agreement between Borrower and Lender, by which Lender has agreed to buy, and Borrower has agreed to sell, substantially all of Borrower's assets to Lender, or to the highest bidder.

1.2     Bankruptcy Case.  "Bankruptcy Case" means the Chapter 11 bankruptcy case filed by Borrower and pending in the Bankruptcy Court.

1.3     Bankruptcy Court.  "Bankruptcy Court" means the United States Bankruptcy Court for the District of Colorado.

1.4     Business Day.  "Business Day" shall mean that portion of any day, other than a Saturday, a Sunday or a legal holiday for commercial banks under the laws of the State of New York, during which Lender is open for substantially all of Lender's normal banking functions.

**Exhibit 1**

**1.5**    Code.  "Code" shall mean the Uniform Commercial Code of Colorado, as the same may from time to time be in effect.

**1.6**    Collateral  "Collateral" shall mean all of the assets of Borrower, as set forth in greater detail in the Security Agreement.

**1.7**    Event of Default.  "Event of Default" shall mean the occurrence of any of the events specified in Section 10 of this Loan Agreement.

**1.8**    Interest Rate.  "Interest Rate" shall mean the Wall Street Journal Prime Rate, as adjusted from time to time, plus three percent (3%).

**1.9**    Interim Order.  "Interim Order" shall mean an interim order approving the advances to be made under this Loan Agreement entered by the Bankruptcy Court in the Bankruptcy Case, after appropriate notice and hearing, containing terms and conditions acceptable to Lender in its sole and absolute discretion.

**1.10**   Final Order.  "Final Order" shall mean a final order approving the advances to be made under this Loan Agreement entered by the Bankruptcy Court in the Bankruptcy Case, after appropriate notice and hearing, containing terms and conditions acceptable to Lender in its sole and absolute discretion.

**1.11**   Loan Agreement.  "Loan Agreement", and such terms as "herein", "hereof", "hereto", "hereby", "hereunder" and the like shall mean and refer to this Loan Agreement, together with any and all Exhibits attached hereto, and any and all supplements, modifications or amendments hereof.

**1.12**   Loan Documents.  "Loan Documents" shall mean this Loan Agreement, the Note, the Security Agreement and all other instruments and documents executed or issued, or to be executed or issued, by Borrower pursuant to this Loan Agreement or pursuant to any of said documents or in connection with the Loan, together with all amendments, modifications, extensions and renewals of any of the foregoing documents.

**1.13**   Maturity Date. "Maturity Date" is defined in Section 3 below.

**1.14**   Note.  "Note" shall mean the promissory note issued to the Lender in accordance with Section 3 hereof.

**1.15**   Operating Budget. "Operating Budget" is defined in Section 5.6 below.

**1.16**   Prepetition Obligations  "Prepetition Obligations" means those obligations of Borrower to the Lender, pursuant to that Promissory Note dated February 25, 2011, made by Borrower to Lender in the original principal amount of $15,000.00, which obligations are secured by all or substantially all of the assets of Borrower.

852968.4                              2

**1.17** <u>Security Agreement</u>. "Security Agreement" shall mean the Agreement executed by Borrower in favor of Lender in accordance with Section 4 hereof.

**2.** <u>TERM LOAN</u>. Lender hereby agrees to lend, and Borrower agrees to borrow, up to the total principal amount of One Hundred Thirty-Five Thousand and no/100 Dollars ($135,000.00) the "Loan"), subject to the terms and conditions set forth below. Upon entry of the Interim Order, the Lender shall advance up to Seventy-Eight Thousand and no/100 Dollars ($78,750.00) (the "Interim Amount"), and upon entry of the Final Order, the Lender shall advance up to One Hundred Thirty-Five Thousand and no/100 Dollars ($135,000.00) (the "Final Amount"). All advances shall be made in accordance with the Operating Budget.

**3.** <u>BORROWER'S NOTE</u>. Subject to all terms, conditions and covenants contained herein, and contemporaneous with the execution of this Agreement, Borrower shall execute a Note in favor of the Lender. Interest shall accrue on all outstanding principal and other outstanding amounts at the Interest Rate prior to an Event of Default, and at the rate of twelve percent per annum (12%) upon occurrence of an Event of Default. All outstanding principal, interest and other amounts due shall be due and payable on the earlier of (a) the closing of the sale of all or substantially all of the Borrower's assets or (b) April 29, 2011 ("Maturity Date").

**4.** <u>COLLATERAL SECURITY</u>. The performance of all covenants and agreements contained in this Loan Agreement and in the other documents executed or delivered as a part of this transaction, and the payment of the Note shall be secured as follows:

**4.1** <u>Security Agreement</u>. Borrower shall execute and deliver to Lender a Security Agreement and UCC financing statements in a form approved by Lender, which, pursuant to order of the Bankruptcy Court, shall grant Lender a first and prior lien on all Collateral, except that the Lender shall hold a junior security interest in that certain Besten 84" 5 Pair Press, subject only to the senior security interest therein held by TruSeal Technologies, Inc.

**4.2** <u>Additional Documents.</u> Borrower shall also execute and deliver such closing certificates, closing statements and other documents that Lender may reasonably request.

**5.** <u>CONDITIONS</u>. The obligation of Lender to perform under this Loan Agreement, and to make each advance contemplated hereunder, is expressly subject to the performance and existence of the following conditions precedent:

**5.1** <u>Loan Documents</u>. This Loan Agreement, the Note, and the Security Agreement shall be duly authorized, executed and delivered to Lender, and appropriate UCC financing statements shall have been filed with the appropriate authorities to perfect the security interests granted Lender pursuant to the Security Agreement.

**5.2**   Orders.  As to the funding of the Interim Amount, the Interim Order shall have been entered by the Bankruptcy Court, and shall have not been stayed, appealed, reversed, or modified.  As to the funding of the Final Amount, the Final Order shall have been entered by the Bankruptcy Court, and shall have not been stayed, appealed, reversed, or modified.

**5.3**   Sale Procedures.  Borrower and Lender shall have reached agreement on procedures for the sale of all or substantially all of the assets of the Borrower to Lender pursuant to the APA, or to the highest bidder, which procedures shall include breakup protection to Lender as set forth in the APA; and Borrower shall have filed a motion to approve such sale procedures with the Bankruptcy Court.

**5.4**   Sale Motion.  Borrower shall have filed a motion seeking approval for the sale of the assets of Borrower to Lender, pursuant to the APA, or to the highest bidder, pursuant to the agreed sale procedures, which sale motion shall seek Court authorization for the closing of the sale as expeditiously as possible, but in no event no later than April 29, 2011.

**5.5**   Operating Budget.  Lender and Borrower shall agree on an operating budget for the period from the date hereof through April 29, 2011 (the "Operating Budget"), which shall set forth on a weekly basis the anticipated revenues and operating expenses of Borrower, including reasonable retainers to legal counsel to Borrower, in a reasonable level of detail and in a format agreed to by Lender and Borrower, which Operating Budget may not be modified by Borrower without the prior consent of Lender.

**5.6**   Material Adverse Change.  No material adverse change in the business, condition (financial or otherwise), operations or prospects of the Borrower shall have occurred, other than as customarily occurs as a result of events leading up to and following the commencement of a proceeding under Chapter 11 of the Bankruptcy Code and the commencement of the Bankruptcy Case.

**5.7**   Insurance.  If required by Lender, Borrower will provide Lender throughout the term of the Loan, with copies of all policies of insurance, or at a minimum, certificates of insurance acceptable to Lender, premiums prepaid, with insurance companies satisfactory to Lender, in such amounts and against such risks as shall be required by Lender in its reasonable judgment, with Lender named as an additional insured thereon.

**5.8**   Absence of Event of Default.  No Event of Default shall have occurred under this Loan Agreement, the Loan Documents, the Interim Order, or the Final Order.

**6.**   REPRESENTATIONS AND WARRANTIES.   In addition to all other representations and warranties of Borrower to Lender, Borrower represents and warrants

as of the date hereof, the closing of the Loan and at all times during the term of the Loan until full repayment thereof, that:

**6.1**     Existence and Authority.    Borrower is and will continue to be a corporation duly organized and validly existing under the laws of the State of Colorado; Borrower has full and legal right, power and authority to enter into and carry out the provisions of this Loan Agreement and all documents signed by Borrower pursuant to or in connection with this Loan Agreement, to borrow money, to give security for borrowing as required by this Loan Agreement, and to consummate the transaction contemplated by this Loan Agreement.

**6.2**     Conflicting Agreements and Restrictions.    Neither the execution and delivery of the Loan Documents nor fulfillment and compliance with the terms and provisions thereof: (i) will result in a breach of the terms, conditions or provisions of, or constitute a default under, or result in any violation of any agreement, instrument, undertaking, judgment, decree, order, writ, injunction, statute, law, rule or regulation to which Borrower is subject, other than any limitations or restrictions contained in the documents related to the Prepetition Obligations preventing the further encumbrance of the assets of Borrower; (ii) will result in the creation or imposition of any lien, charge or encumbrance on, or security interest in, any property now or hereafter included in the Collateral pursuant to the provisions of any mortgage, indenture, security agreement, contract, undertaking or other agreement other than the liens and security interests in favor of Lender created by the Loan Documents; or (iii) except as will be required to be obtained from the Bankruptcy Court, will require any authorization, consent, license, approval or authorization of or other action by, or notice or declaration to, or registration with, any court or administrative or governmental department, commission, board, bureau, authority, agency or body (domestic or foreign), or, to the extent that any such consent or other action may be required, it has been validly procured or duly taken.

**6.3**     Actions and Proceedings.    There is no action or proceeding against, or investigation of Borrower pending or threatened, which questions the validity of the Loan Documents, or which in any way materially impairs or adversely affects the ability of Borrower to perform its obligations under the Loan Documents.

**6.4**     Financial Condition.    The financial statements of Borrower, including the Statements of Financial Affairs and Schedules of Assts and Liabilities filed in the Bankruptcy Case, which have been furnished to Lender, are correct and complete and fairly reflect the financial condition of the Borrower as of the dates thereof, to the best of Borrower's knowledge and belief.  Said financial statements have been prepared in accordance with generally accepted accounting principles consistently applied through the periods involved therein, and there has occurred no material adverse change in the financial condition of Borrower from the effective dates of said financial statements to the date hereof.    Except as otherwise may be

disclosed by Borrower to Lender prior to the Effective Date hereof, the Borrower has no contingent obligations, unusual or long-term commitments, unrealized or anticipated losses from any unfavorable commitment or liabilities for taxes not reflected in such financial statements which are individually or in the aggregate substantial in relation to the financial condition of Borrower.

**6.5**     Full Disclosure.    Neither the Loan Documents nor any statement or documents referred to therein, contemplated thereby or delivered to Lender by Borrower or any other party on its behalf contains or will contain any untrue statement, or omits or will omit to state a material fact necessary to make the statements therein not misleading.

**6.6**     No Violation of Applicable Law.   Borrower has not violated and is not violating any applicable statute, regulation or ordinance of the United States of America or any foreign country, or of any state, municipality or any other jurisdiction, or of any agency thereof in any respect materially adversely affecting its property, assets, operations or condition, financial or otherwise.

**6.7**     Permits. Borrower has all governmental and private permits, certificates, consents, licenses, and franchises which in any respect (i) are material to its business, property, assets, operations or condition, financial or otherwise, or (ii) are necessary for it to carry on its business as now being conducted or as contemplated to be conducted. All such governmental and private permits, certificates, licenses, consents and franchises are valid and subsisting, and Borrower is not in violation thereof, except as previously disclosed to Lender in writing,

**6.8**     Ownership of Collateral; Liens.   Borrower shall have good and marketable title to the Collateral, and no portion of the Collateral is or will be subject to any mortgage, pledge, security interest, encumbrance, lien or charge of any kind, excluding only encumbrances in favor of Lender, encumbrances in favor of the Prepetition Lender, and the encumbrance held by TruSeal Technologies, Inc. on equipment described as a Besten 84" 5 Pair Press, as defined in the Interim Order and Final Order.

**6.9**     Survival of Representations.   All representations and warranties made herein or in any other Loan Documents will survive the delivery of the Note, and any investigation at any time made by or on behalf of Lender shall not diminish Lender's right to rely thereon.   All statements contained in any certificate or other instrument delivered by or on behalf of any Borrower under or pursuant to this Loan Agreement or any other Loan Documents or in connection with the transactions contemplated hereby or thereby shall constitute representations and warranties made hereunder.

**7.**    <u>BORROWER'S AFFIRMATIVE COVENANTS</u>.  Until the payment in full of the Loan or unless Lender shall otherwise consent in writing, Borrower agrees to perform or cause to be performed the following:

   **7.1**    <u>Maintenance</u>.  Borrower will maintain its existence and remain in good standing in the States of Colorado and Borrower will maintain or cause the Collateral to be maintained in good condition and repair, and will maintain all intellectual property serving as Collateral for the Loan, including maintaining appropriate copyright, trademark, patent, and license registrations and filings.

   **7.2**    <u>Compliance with Laws</u>.  Borrower will comply with all statutes, laws, rules or regulations to which Borrower is subject or by which their properties are bound or affected.

   **7.3**    <u>Further Assurances</u>.  Borrower will, from time to time, promptly cure any defects or omissions in the execution and delivery of, or the compliance with the Loan Documents, including the execution and delivery of additional documents reasonably requested by Lender.

   **7.4**    <u>Performance of Obligations</u>.  Borrower will pay the Note according to the reading, tenor and effect thereof and will do and perform every act and discharge all of the obligations provided to be performed and discharged under the Loan Documents at the time or times and in the manner therein specified.

   **7.5**    <u>Lender's Access</u>.  Borrower will, during normal business hours and as often as Lender may reasonably request, permit any of Lender's officers, or any authorized representatives of Lender, to visit and inspect its operations and the Collateral.

   **7.6**    <u>Notification of Liens</u>.  Borrower will notify Lender of the existence or asserted existence of any mortgage, pledge, lien, charge or encumbrance on any of the Collateral, or any part thereof, forthwith upon any of the Borrower's obtaining knowledge thereof.

   **7.7**    <u>Financial Statements</u>. Borrower will maintain adequate and accurate books and records of account in accordance with generally accepted accounting principles, consistently applied. Lender shall have the right (upon reasonable prior notice) to examine and copy such books and records at Lender's sole cost and expense, to discuss the Collateral and all financial matters relating thereto, and to be informed as to the same from time to time as Lender might reasonably request, but in any event annually.

   **7.8**    <u>Reports and Financial Data</u>.

      **7.8.1**    By noon, Eastern time, on each Wednesday during the term of this Agreement, Borrower shall deliver to Lender a monthly line-by-line

variance report for the preceding week and on a cumulative basis for the period from the date hereof to the last day of such preceding week, which variance reports shall be in form and substance reasonably acceptable to Lender comparing actual cash receipts and disbursements to amounts projected in the Operating Budget.

**7.8.2**  Borrower shall deliver monthly financial statements, including income statements, balance sheets, and sources and uses of cash, and other similar financial reports prepared by the Borrower in the ordinary course of its business, all within ten (10) Business Days after the end of each month.

**7.8.3**  Borrower shall deliver annual company-prepared financial statements within ninety (90) days of fiscal year end and federal tax returns within thirty (30) days after filing.

**7.9**   Taxes. Borrower will pay when due all postpetition taxes, assessments, governmental charges or levies (including foreign governmental authorities), and all postpetition claims for labor, materials, supplies, rent and other obligations which, if unpaid, might become a lien against its properties.

**7.10**   Events with Respect to ERISA. Subject to the proviso at the end of this sentence, as soon as possible and in any event within thirty (30) days after Borrower knows or has reason to know that any reportable event described in Sections 4042(a) or 4043(b) of ERISA with respect to any employee pension or other benefit plan or trust maintained by or related to Borrower has occurred, or that PBGC has instituted or will institute proceedings under ERISA to terminate any such plan, Borrower will deliver to Lender (i) a certificate of an officer of Borrower as applicable setting forth details as to such event and the action which Borrower as applicable proposes to take with respect thereto, and (ii) a copy of any notice delivered by PBGC evidencing its intent to institute such proceedings; provided, however, the foregoing covenant shall not be applicable unless the event or occurrence referenced in this covenant could reasonably be expected to affect the ability of Borrower to perform its obligations hereunder or to repay the Loan. For all purposes of this covenant, Borrower shall be deemed to have all knowledge or knowledge of all facts attributable to the plan administrator of each such plan under ERISA. Borrower will furnish to Lender (or cause such plan administrator to furnish to Lender) the annual report for each plan covered by ERISA maintained by or related to Borrower as filed with the Secretary of Labor not later than ten (10) days after the receipt of a request from Lender in writing for such report.

**7.11**   Other Notifications. Borrower will notify Lender as soon as practicable, but in any event within five (5) days after Borrower knows or has reason to know that any of the following has occurred: (i) an Event of Default, (ii) any material

adverse change in the nature of or property comprising the Collateral or the Borrower's business operations, (iii) any change in the accounting practices and procedures of Borrower, including a change in Borrower's fiscal year, and (iv) any other event, occurrence or circumstance which indicates the reasonable likelihood of the occurrence of a material adverse change in the financial condition, business or operations of Borrower.

**7.12** <u>Sale or Other Disposition of Assets</u>.  Borrower shall seek expeditious approval of the sale of its assets to Lender, pursuant to the APA, or to the highest bidder therefore, in accordance with the sale procedures agreed to by the parties.

**7.13** <u>Use of Loan Proceeds</u>.  Borrower shall use Loan proceeds only in accordance with the Operating Budget.

**8.** <u>BORROWER'S NEGATIVE COVENANTS</u>.  Until payment in full of the Loan or unless Lender shall otherwise consent in writing, Borrower will not perform or permit to be performed any of the following acts:

**8.1** <u>Creation or Existence of Liens</u>.  Borrower will not create, assume or suffer to exist any mortgage, pledge, lien, charge or encumbrance on the Collateral, or any part thereof.

**8.2** <u>Transfer of Property</u>.  Borrower shall not sell, transfer or convey all or any part of the Collateral or any interest therein, and Borrower shall not permit any change in the ownership or membership of Borrower, without the prior written consent of the Lender.

**8.3** <u>Operating Budget</u>.  Borrower shall not make any disbursements not provided for in the Operating Budget or otherwise approved by Lender in writing.

**8.4** <u>Continuance of Business Operations</u>.  Borrower shall continue to operate its business in the ordinary course, and shall not make a material modification to such operations, nor cease operating all or any substantial component of Borrower's business operations, without the prior written consent of Lender, which consent shall not be unreasonably withheld.

**8.5** <u>Modification of Organizational Documents:</u>  Borrower shall not participate in, suffer or permit the amendment, modification, restatement, cancellation or termination of any document now or hereafter evidencing or relating to Borrower, including, without limitation, Borrower's respective Articles of Incorporation and Bylaws without the prior written consent of Lender.

**9.** <u>ADMINISTRATION OF LOAN</u>.  Notwithstanding any language in this Agreement seemingly to the contrary, Borrower shall not be entitled to any disbursement of Loan proceeds hereunder unless and until Borrower has satisfied all of the conditions of lending set forth in section 5 of this Agreement, or Lender has waived any particular

condition in writing. Lender shall make disbursements under the Loan in the following manner:

**9.1**   <u>Compliance with Operating Budget</u>. Notwithstanding any language in this Agreement seemingly to the contrary, all disbursements under this Agreement and the Note shall be made in accordance with the Operating Budget. Deviations from the Operating Budget must be approved in advance in writing by the Lender. The Operating Budget will be monitored monthly on an aggregate basis. If total costs, exceed 105% of the amount therefore set forth in the Operating Budget for any month, then Lender shall have no obligation to fund any such excess amounts, but may do so in its sole and absolute discretion. The election of Lender to advance funds in excess of the amounts set forth in the Operating Budget for any period shall not waive the Lender's right to object to, and to refuse funds, amounts in excess of the Operating Budget for any subsequent period.

**9.2**   <u>Request for Funds</u>. Disbursements will be made no more frequently than weekly, unless Lender agrees in writing to more frequent disbursements. Borrower shall deliver to Lender a Request for Funds stating the amount of disbursement requested under the Note, and shall correlate such Request for Funds with the corresponding period set out in the Operating Budget. Borrower shall deliver not more than one (1) Request for Funds each week, unless otherwise agreed to by Lender in writing. The Request for Funds shall be made on a form reasonably acceptable to Lender and shall be in substance reasonably satisfactory to Lender and shall be signed by Borrower. Each Request for Funds shall be delivered to Lender at least three (3) Business Days before the requested date of disbursement. Lender shall, on the date the requested advance is to be made or as soon thereafter as all conditions precedent to such advance have been satisfactorily met advance funds under this Agreement by wire transfer to the Borrower's operating account, or otherwise as directed by Borrower..

**10.**   <u>EVENTS OF DEFAULT</u>. The Events of Default listed in the Security Agreement, the Interim Order, and the Final Order are hereby incorporated in this Loan Agreement by this reference and made a part of this Loan Agreement and shall constitute "Events of Default" hereunder and under each of the other Loan Documents. These Events of Default include, but are not limited to, the following:

**10.1**   <u>Nonpayment of Note</u>. Default in payment when due of any interest on or principal of the Note.

**10.2**   <u>Other Nonpayment</u>. Default in payment when due of any amount (other than principal and interest) payable to Lender under the terms of this Loan Agreement or any amount payable to Lender under the terms of any other agreement between Borrower and Lender, but excluding any obligations owed to any Lender on account of the Prepetition Obligations.

**10.3**   Breach of Covenants.   Default by Borrower in the performance or observance of any covenant contained in this Loan Agreement or any of the other Loan Documents or any instrument executed in connection with the Loan or any other instrument delivered to Lender in connection with this Loan Agreement, or the Interim Order or Final Order, including, without limitation, the falsity or breach of any representation, warranty or covenant.

**10.4**   Event of Default Under Other Loan Documents.   Any Event of Default occurs under the Note, the Security Agreement or any of the other Loan Documents, the Interim Order, or the Final Order, or any provision of the Loan Documents shall cease to be valid and binding on the Borrower, or the Borrower shall so assert in any pleading filed in any court.

**10.5**   Representations and Warranties.   Any representation or warranty made by the Borrower in the Interim Order, the Final Order, this Agreement, or any other Loan Document, or that is contained in any certificate, document or financial or other statement furnished by it at any time under or in connection with the Loan shall prove to have been inaccurate in any material respect on or as of the date made or deemed made or furnished; or

**10.6**   Bankruptcy Events.   (i) Conversion of the Borrower's Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code; (ii) the appointment of a trustee in Borrower's Bankruptcy Case without the consent of the Lender; (iii) the appointment of an examiner in either Bankruptcy Case with expanded powers without the consent of the Lender; (iv) the dismissal of Borrower's Bankruptcy Case; (v) any action by Borrower to seek to amend, modify, or reverse the Interim Order or the Final Order without the prior written consent of Lender; (vi) the entry of any order modifying, reversing, revoking, staying, rescinding, vacating or amending the Interim Order or the Final Order without the consent of the Lender; (vii) the Interim Order shall not have been replaced by a Final Order acceptable to the Lender in its sole discretion within twenty-five (25) days of the entry of the Interim Order; or (viii) the Bankruptcy Court shall enter an order granting relief from the automatic stay to the holder or holders of any other security interest or lien (other than the Lender) in any Collateral to permit the pursuit of any judicial or non-judicial transfer or other remedy against any of the Collateral.

**10.7**   Sale Procedures.   The Borrower shall have proposed, in the Bankruptcy Case, procedures for the sale or other disposition of all or substantially all of Borrower's assets, which have not been  approved by the Lender.

**10.8**   Sale Order.   The Court shall have failed to approve the sale of the assets of Borrower to the highest bidder therefor by order entered in the Bankruptcy Case by April 29, 2011.

**10.9**   Bankruptcy Priority.   (a) The Borrower shall (i) bring or consent to any motion or application in the Bankruptcy Case to obtain financing from any person

other than the Lender under section 364 of the Bankruptcy Code (other than with respect to a financing used, in whole or part, to repay in full in cash all obligations due under the Loan Documents); (ii) grant any lien that is *pari passu* or senior to any lien granted to the Lender under the Interim Order or Final Order, except as permitted therein; or (iii)  grant a superpriority claim, other than that granted in the Interim Order or Final Order (and other than with respect to the Carve-Out, as defined in the Interim Order or Final Order, or adequate protection provided to the Lender), which is *pari passu* with or senior to any of the claims of the Lender against the Borrower hereunder; or (b) any other party shall seek and obtain allowance of any order in the Bankruptcy Case to recover from any portion of the Collateral any costs or expenses of preserving or disposing of such Collateral under section 506(c) of the Bankruptcy Code; or

**10.10**  Operating Budget.  Borrower shall (i) make expenditures in excess of 105%, in the aggregate, in any month, from expenditures permitted in the Operating Budget, unless waived by the Lender; (ii) fail to provide an Operating Budget that is acceptable to Lender in accordance with the terms set forth herein, the Interim Order or the Final Order; or (iii) make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any prepetition indebtedness, whether prepetition or postpetition, and (y) otherwise to the extent set forth in the Operating Budget; unless approved by the Lender or as authorized by the Bankruptcy Court after notice and hearing.

**10.11**  Termination of APA.  Either party shall have terminated the APA in accordance with its terms, or the Bankruptcy Court shall have approved the sale of the assets of Borrower, including the Collateral, to a party other than Lender or an affiliate of Lender.

**11.**   REMEDIES.  Upon the occurrence of an Event of Default, subjection to Section 13.3.2, the Lender may, on behalf of the Lender, at its option:

**11.1**   Cessation of Funding.  Cease all funding under this Loan Agreement.

**11.2**   Acceleration of Note; Exercise of Remedies.  Declare the Note to be immediately due and payable whereupon the Note shall become forthwith due and payable without presentment, demand, protest or further notice of any kind, and Lender shall be entitled to proceed simultaneously or selectively and successively to enforce its rights under the Note, this Loan Agreement and any of the other Loan Documents, or any one or all of them, subject to any limitations thereon set forth in the Interim Order or Final Order. Nothing contained herein shall limit Lender's rights and remedies available under applicable laws, except to the extent such rights and remedies are limited by the Interim Order or Final Order.

**11.3**   Selective Enforcement.  In the event Lender shall elect to selectively and successively enforce its rights under any of the Loan Documents, such action shall not be deemed a waiver or discharge of any other lien, encumbrance or security

instrument securing payment of the Note until such time as Lender shall have been paid in full all sums advanced under the Note. The foreclosure of any lien provided pursuant to this Loan Agreement without the simultaneous foreclosure of all such liens shall not merge the liens granted which are not foreclosed with any interest which Lender might obtain as a result of such selective and successive foreclosure.

12.    GENERAL PROVISIONS.  Lender and Borrower agree as follows:

**12.1**    Expenses.  Borrower agrees to pay all fees, expenses and charges in respect to the Loan contemplated by this Loan Agreement, including, without limiting the generality thereof, the following:

> **12.1.1** reasonable fees and expenses of counsel employed by Lender in connection with the documentation and closing of the Loan, and upon an Event of Default, all reasonable fees and expenses of counsel employed by Lender in connection with exercising any rights or remedies hereunder, or under any other Loan Document;

> **12.1.2** recording and filing fees;

> **12.1.3** other reasonable fees and expenses involved in the closing of this Loan and the reasonable fees and expenses payable by Lender which are incidental to the successful enforcement or successful defense of this Loan Agreement or any of the other Loan Documents.

**12.2**    Notices.  Any notices or other communications required or permitted hereunder shall be sufficiently given if delivered personally, or sent by overnight delivery, postage prepaid, and addressed as listed below or to such other address as the party concerned may substitute by written notice to the other.  All notices shall be deemed received within three (3) days (excluding Saturdays, Sundays and holidays recognized by national banking associations) after being mailed:

To Borrower:                    Accent Windows, Inc.
                                Attn:  Terry Marcovich
                                12300 Pecos Street
                                Westminster, Colorado 80234

With a copy to:                 Jeffrey S. Brinen
                                Kutner Miller Brinen, P.C.
                                303 E. 17th Avenue
                                Denver, CO  80203

To Lender:                    P.H. Tech, Inc.  
                                    Attn:  Serge Falardeau  
                                    8650, boul.de la Rive-Sud  
                                    Lévis Canada G6V 6N8

with a copy to:          Caroline C. Fuller  
                                    Fairfield and Woods, P.C.  
                                    1700 Lincoln Street, Suite 2400  
                                    Denver, CO  80203

**12.3**   <u>Amendments and Waivers.</u>  No term, covenant, agreement or condition of this Agreement or any of the Loan Documents may be amended or waived, nor any departure therefrom be consented to, without the prior written consent of Lender

**12.4**   <u>Non-Waiver; Cumulative Remedies.</u>  No failure on the part of Lender to exercise and no delay in exercising any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise by Lender of any right hereunder preclude any other or further right of exercise thereof.  The remedies herein provided are cumulative and not alternative.

**12.5**   <u>Assignment</u>.  Neither this Loan Agreement, nor the loan proceeds hereunder, shall be assignable by Borrower without the prior written consent of Lender.  No obligation under this Loan Agreement, nor the rights under any Note, may be assigned by any Lender, nor may any Lender sell, design, delegate or create a participating interest in its obligations hereunder, without the prior written consent of the Lender and Required Lender.

**12.6**   <u>Counterparts.</u>  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and shall be binding upon all parties, their successors and assigns, and all of which taken together shall constitute one and the same agreement.

**12.7**   <u>Descriptive Headings</u>.  The descriptive headings of the paragraphs of this Loan Agreement are for convenience only and shall not be used in the construction of the terms hereof.

**12.8**   <u>Integrated Agreement</u>.  This Loan Agreement and the Loan Documents executed in connection herewith constitute the entire agreement between Lender and Borrower, and there are no agreements, understandings, warranties or representations between the parties regarding the Loan other than those set forth herein or in the Loan Documents.

**12.9**   <u>Time of Essence</u>. Time is of the essence of this Loan Agreement.

**12.10**  Binding Effect.  This Loan Agreement shall be binding upon and inure to the benefit of Lender and Borrower and their respective successors, legal representatives and assigns.

**12.11**  Third-Party Beneficiary.  Nothing in this Loan Agreement, express or implied, is intended to confer upon any person, other than Lender and Borrower and their respective successors and assigns, any rights or remedies under or by reason of this Loan Agreement.

**12.12**  Right to Defend.  Lender shall have the right, but not the obligation, at Borrower's expense, to commence, to appear in or to defend any action or proceeding (initiated by a third party against Borrower) purporting to affect the rights or duties of the parties hereunder and in connection therewith pay out of proceeds of the Loan all necessary expenses, including fees of counsel, if Borrower fails to so commence, appear in or defend any such action or proceeding with counsel satisfactory to Lender.

**12.13**  Applicable Law. THIS LOAN AGREEMENT AND THE DOCUMENTS ISSUED AND EXECUTED HEREUNDER SHALL BE DEEMED TO BE A CONTRACT MADE UNDER THE LAWS OF THE STATE OF NEW YORK AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF COLORADO.   NOTHING IN THIS LOAN AGREEMENT SHALL BE CONSTRUED TO CONSTITUTE LENDER AS JOINT VENTURER WITH BORROWER, OR TO CONSTITUTE A PARTNERSHIP BETWEEN THE PARTIES.

**12.14**  Waiver of Jury Trial.  THE BORROWER AND LENDER JOINTLY AND SEVERALLY WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, OR RELATED TO, THE SUBJECT MATTER OF THE LOAN DOCUMENTS.   THIS WAIVER IS KNOWINGLY, INTENTIONALLY, AND VOLUNTARILY MADE BY THE BORROWER, AND THE BORROWER ACKNOWLEDGES THAT NEITHER LENDER NOR ANY PERSON ACTING ON BEHALF OF THE LENDER HAS MADE ANY REPRESENTATIONS OF FACT TO INDUCE THIS WAIVER OF TRIAL BY JURY OR HAS TAKEN ANY ACTIONS WHICH IN ANY WAY MODIFY OR NULLIFY ITS EFFECT.   THIS WAIVER IS KNOWINGLY, INTENTIONALLY, AND VOLUNTARILY MADE BY THE LENDER, AND THE LENDER ACKNOWLEDGES THAT NEITHER BORROWER NOR ANY PERSON ACTING ON BEHALF OF ANY BORROWER HAS MADE ANY REPRESENTATIONS OF FACT TO INDUCE THIS WAIVER OF TRIAL BY JURY OR HAS TAKEN ANY ACTIONS WHICH IN ANY WAY MODIFY OR NULLIFY ITS EFFECT.   EACH PARTY FURTHER ACKNOWLEDGES THAT IT HAS BEEN REPRESENTED (OR HAS HAD THE OPPORTUNITY TO BE REPRESENTED) IN THE SIGNING OF THE LOAN DOCUMENTS AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL

COUNSEL. EACH PARTY ACKNOWLEDGES THAT IT HAS READ AND UNDERSTANDS THE MEANING AND RAMIFICATIONS OF THIS WAIVER PROVISION. THIS ASSIGNMENT CONSTITUTES A WRITTEN CONSENT TO WAIVER OF TRIAL BY JURY AND EITHER PARTY IS AUTHORIZED AND EMPOWERED TO FILE THIS ASSIGNMENT WITH THE CLERK OR JUDGE OF ANY COURT OF COMPETENT JURISDICTION AS A STATUTORY WRITTEN CONSENT TO WAIVER OF TRIAL BY JURY.

IN WITNESS WHEREOF, Lender and Borrower have caused this Loan Agreement to be duly executed effective as of the day and year first above written.

"LENDER":           **P.H. TECH, INC.**
                    A Canadian corporation

                    By:_____
                        Serge Falardeau
                        Title: _____


"BORROWER":         **ACCENT WINDOWS, INC.**
                    a Colorado corporation

                    By:_____
                        Terry Marcovich
                        President

852968.4                    16

## Chapter 11 DIP financing
## 135k over 3 months

| | March | Week 1 | week 2 | week 3 | week 4 | April | May | |
|---|---|---|---|---|---|---|---|---|
| **REVENUE** | | | | | | | | |
| LICENSE SALES | 20,000 | 5,000 | 5,000 | 5,000 | 5,000 | 30,000 | 40,000 | 90,000 |
| WHOLESALE SALES | 10,000 | 2,500 | 2,500 | 2,500 | 2,500 | 15,000 | 20,000 | 45,000 |
| COMMERCIAL SALES | | | | | | | | |
| RETAIL INSTALLS | 300,000 | 75,000 | 75,000 | 75,000 | 75,000 | 350,000 | 400,000 | 1,050,000 |
| **TOTAL REVENUE** | 330,000 | 82,500 | 82,500 | 82,500 | 82,500 | 395,000 | 460,000 | 1,185,000 |
| | | | | | | | | |
| **EXPENSES (Manufacturing)** | | | | | | | | |
| MANUFACTURING COSTS | | | | | | | | |
| CONTRACT LABOR WINDOWS | 89,100 | 22,275 | 22,275 | 22,275 | 22,275 | 106,650 | 124,200 | 319,950 |
| **TOTAL EXPENSES/MANUFACTURING** | 89,100 | 22,275 | 22,275 | 22,275 | 22,275 | 106,650 | 124,200 | 319,950 |
| **GROSS MARGIN** | 240,900 | 60,225 | 60,225 | 60,225 | 60,225 | 288,350 | 335,800 | 865,050 |
| | | | | | | | | 0.73 |
| | | | | | | | | |
| **WAGES & PAYROLL EXPENSE** | | | | | | | | |
| Installation | 39,000 | 9,750 | 9,750 | 9,750 | 9,750 | 45,500 | 52,000 | 136,500 |
| Service | 7,500 | 1,875 | 1,875 | 1,875 | 1,875 | 7,500 | 7,500 | 22,500 |
| Sales | 37,200 | 9,300 | 9,300 | 9,300 | 9,300 | 43,800 | 50,400 | 131,400 |
| Marketing | 2,000 | 500 | 500 | 500 | 500 | 2,000 | 2,000 | 6,000 |
| Accounting | 4,000 | 1,000 | 1,000 | 1,000 | 1,000 | 3,000 | 3,000 | 10,000 |
| General Administration | 5,000 | 1,250 | 1,250 | 1,250 | 1,250 | 5,000 | 5,000 | 15,000 |
| Manufacturing | 30,000 | 7,500 | 7,500 | 7,500 | 7,500 | 43,000 | 48,000 | 121,000 |
| R&D/Facilities/Mtnc | 5,000 | 1,250 | 1,250 | 1,250 | 1,250 | 5,000 | 5,000 | 15,000 |
| Shipping/Receiving/Warehouse | 5,600 | 1,400 | 1,400 | 1,400 | 1,400 | 5,600 | 5,600 | 16,800 |
| Production | 3,600 | 900 | 900 | 900 | 900 | 3,600 | 3,600 | 10,800 |
| Officer Wages | 8,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 12,000 |
| HEALTH INSURANCE | 5,000 | 1,250 | 1,250 | 1,250 | 1,250 | 5,000 | 5,000 | 12,000 |
| PAYROLL TAXES | 48,477 | 12,119 | 12,119 | 12,119 | 12,119 | 54,780 | 60,753 | 164,009 |
| **TOTAL WAGE EXPENSE** | 200,377 | 50,094 | 50,094 | 50,094 | 50,094 | 225,780 | 249,853 | 676,009 |
| | | | | | | | | |
| **SELLING/ADMIN. EXPENSES** | | | | | | | | |

**Exhibit 2**

| | | | | | | |
|---|---|---|---|---|---|---|
| ADVERTISING/TV & RADIO | 16,000 | 4,000 | 4,000 | 4,000 | 16,000 | 16,000 | 48,000 |
| ADV/PUBLISHED/YELLOW PAGES | 1,000 | 250 | 250 | 250 | 1,000 | 1,000 | 3,000 |
| ADV/PROMO MISC. | 1,000 | 250 | 250 | 250 | 1,000 | 1,000 | 3,000 |
| HOMESHOW FEES & MISC.EXP. | 1,100 | 275 | 275 | 275 | 1,100 | 1,100 | 3,300 |
| ACCOUNTANTS/ATTORNEYS | - | | | | 7,500 | 7,500 | 15,000 |
| AUTO/TRAVEL MFG | 2,000 | 500 | 500 | 500 | 2,000 | 2,000 | 6,000 |
| AUTO/INST/VANS | 1,000 | 250 | 250 | 250 | 1,000 | 1,000 | 3,000 |
| EQUIPMENT RENTAL | 1,000 | 250 | 250 | 250 | 1,000 | 1,000 | 3,000 |
| FEES/PERMITS/LICENSES/MISC TAX | 4,950 | 1,238 | 1,238 | 1,238 | 5,925 | 5,925 | 17,777 |
| FINANCE & VISA FEES | 3,000 | 750 | 750 | 750 | 3,500 | 4,000 | 10,500 |
| FREIGHT IN PURCHASE | 10,000 | 2,500 | 2,500 | 2,500 | 10,000 | 10,000 | 30,000 |
| INSURANCE BUSINESS | | | | | | | |
| OFFICE SUPPLIES/COMPUTER/GARYCO | 1,500 | 375 | 375 | 375 | 10,000 | 10,000 | 20,000 |
| RENT PECOS | 35,826 | 8,967 | 8,967 | 8,967 | 35,826 | 35,826 | 107,480 |
| RENT/SHOWROOMS (NEW MEXICO) | 2,500 | 625 | 625 | 625 | 2,500 | 2,500 | 7,500 |
| NEW MEXICO EXPENSE | 2,000 | 500 | 500 | 500 | 2,000 | 2,000 | 6,000 |
| REPAIR/SHOP/TOOLS/TRASH | 2,000 | 500 | 500 | 500 | 2,000 | 2,000 | 6,000 |
| UTILITIES | 7,500 | 1,875 | 1,875 | 1,875 | 7,500 | 7,500 | 22,500 |
| TELEPHONE | 4,500 | 1,125 | 1,125 | 1,125 | 4,500 | 4,500 | 13,500 |
| TOTAL SELLING/ADMIN. EXPENSES | 96,876 | 24,220 | 24,220 | 24,220 | 115,851 | 117,326 | 330,057 |
| TOTAL MONTHLY EXPENSES | 297,253 | 74,314 | 74,314 | 74,314 | 341,631 | 367,179 | 1,006,066 |
| NET INCOME TOTAL | $ (56,353) | $(14,089) | $(14,089) | $ (14,089) | $ (53,281) | $ (31,379) | (141,016) |
| DIP Financing | 45000 | 11250 | 11250 | 11250 | 45000 | 45000 | 135,000 |
| Total | $ (11,353) | $ (2,839) | $ (2,839) | $ (2,839) | $ (8,281) | $ 13,621 | (6,016) |