UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| IN RE: | ) |
| | ) |
| ACCENT WINDOWS, INC., | ) Case No. 11- -SBB |
| EIN #84-1292301 | ) Chapter 11 |
| | ) |
| Debtor. | ) |
| | ) |

**AFFIDAVIT OF TERRY MARCOVICH IN SUPPORT OF FIRST DAY MOTIONS**

I, Terry Marcovich, hereby state under penalty of perjury

1. I am president of Accent Windows, Inc. (the "Debtor" or "Accent"), and am familiar with the financial condition of the Debtor and its day-to-day operations.

2. The Debtor is continuing to operate its business as Debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3. The Debtor is a custom manufacturer specializing in energy efficient vinyl replacement windows and patio doors manufactured in the Debtor's Westminster, Colorado facility. The Debtor's replacement doors and windows are sold in Colorado, Arizona, Utah, New Mexico, Texas, Montana, and Wyoming.

4. This is the Debtor's second Chapter 11 bankruptcy case. The Debtor previously filed for relief under Chapter 11 of the Bankruptcy Code on November 4, 2008, and had its plan of reorganization was confirmed on September 9, 2009.

5. Accent Window Products, Inc. was founded in 1982, at which time its primary business was manufacturing storm windows. By the late 1980's, this company was manufacturing vinyl replacement windows, and selling products on a wholesale basis. In 1995, the Debtor entity, Accent Windows, Inc., was formed and sold windows directly to homeowners on a retail basis. In 1997, the two entities merged and Accent Windows, Inc. was the surviving entity. Thereafter, the Debtor terminated its wholesale operation in order to concentrate solely on manufacturing and retail sales.

6. The founders of the Accent business in 1982, Tim and Sherry Marcovich (my parents), decided to retire from the business in the late 1990's. They retained all of the voting

shares of stock in Accent, but conveyed the majority of the non-voting stock of the Debtor in equal shares to me, Tracy Klein (their daughter), and Richard Roeding (their friend and a long-time employee). Roeding was tasked with handling the finances and operations.

7. Roeding was ousted in May 2007 due to mismanagement and self-dealing, which placed Accent in a troubled financial state. Accent's already weakened financial state worsened with the economic decline in 2008, and Accent filed a voluntary petition pursuant to chapter 11 of the Bankruptcy Code on November 4, 2008.

8. Accent performed reasonably well, and its plan of reorganization was confirmed on September 9, 2009. While the bankruptcy case was pending Accent's main competitors effectively spread word of case, which negatively impacted our sales. I believed that this would become a non-issue once Accent emerged from Bankruptcy. However, sales continued to decline due, at least in part, to consumers' fear that Accent was not stable.

9. I, together with Andy Klein, Accent's former vice-president, spent a significant amount of time and effort marketing Accent to be sold as an ongoing operation. Although there was some interest expressed by several parties, PH Tech, Inc. was the only party with whom Accent negotiated a Letter of Intent. Accent and PH Tech, Inc. have entered into a Letter of Intent pursuant to which PH Tech, Inc. will acquire substantially all of the assets of Accent, subject to a competitive bidding process and sale pursuant to Section 363 of the Bankruptcy Code. The parties are in the process of finalizing the terms of an Asset Purchase Agreement for that sale. The purchase price proposed to be paid by PH Tech for the assets of the Debtor is in an amount significantly in excess of what I believe the Debtor would realize in a complete liquidation of those assets.

A. *DIP Loan*

10. Accent no longer has the necessary cash flow to continue operating.

11. Due to Accent's cash flow problems, it was unable to fund retainers necessary to commence this bankruptcy case. PH Tech, Inc. agreed to provide initial funding for the professionals retained by Accent, and it made a loan to Accent in the principal amount of Fifteen Thousand and no/100 Dollars. The Note, dated as of February 25, 2011, is secured by all assets of Accent.

12. Accent filed the captioned Chapter 11 bankruptcy case on March 4, 2011 (the "Petition Date"). Accent will promptly request that the Court establish an auction sale procedure through which it will solicit bids for its assets and an auction sale will be conducted.

13. In order to maintain its operations pending a sale of its assets, the Debtor is in need of funds with which to assist in meeting its ongoing operating expenses and the costs of the Chapter 11 Case.

14. Currently, the Debtor's revenue is insufficient to pay its basic overhead expenses. PH Tech ("Lender") has agreed to provide the Debtor with postpetition financing in the form of a line of credit on a final basis in aggregate principal amount of $135,000.00 (the "**DIP Facility**") and the loan under such facility (the "**DIP Loan**") on the terms set forth in the Loan Agreement attached to the Debtor's Motion Authorizing the Debtor to Obtain Postpetition Secured Financing, Authorizing the Debtor's Use of Cash Collateral on an interim and final basis, Granting Adequate Protection to Prepetition Lender, Modifying the Automatic Stay, and Requesting a Final Hearing on Use of Cash Collateral (the "**DIP Loan/Cash Collateral Motion**").

15. If approved, the DIP Facility and DIP Loan will be used by the Debtor to meet its post-petition operating expenses and costs associated with the case. The Lender is not affiliated with the Debtor.

16. The Lender is one of the Debtor's secured creditors, and anticipates being the stalking horse in the Debtor's proposed bidding and auction procedures.

17. If the Debtor does not obtain authorization to borrow under the DIP Facility, the Debtor will suffer immediate and irreparable harm. The Debtor believes the terms of the proposed loan are reasonable and the Debtor does not believe it can obtain a loan with better terms at this time. The Debtor has sought out other sources of financing but has not been successful in finding any party willing to extend it credit.

18. The Debtor is unable to obtain adequate unsecured credit allowable as an administrative expense under Bankruptcy Code section 503, or other financing under Bankruptcy Code sections 364(c) or (d), on equal or more favorable terms than those set forth in the DIP Facility Documents based on the totality of the circumstances.

19. I believe that approval of the DIP Loan is in the best interest of the Debtor, its creditors and the estate as it will allow the Debtor to maintain its ongoing business operations, and provide the Debtor with an opportunity to sell its assets as a going concern that maximizes

the distribution to creditors. The Debtor believes that the proposed loan is reasonable and will assist in preserving and enhancing the Debtor's going concern value.

B. *Cash Collateral*

20. In order to pay necessary ongoing operating expenses, the Debtor must immediately use Cash Collateral in which the Lender has an interest. Without the use of cash collateral, the Debtor will not be able to pay employees, rent, suppliers, and other costs associated with goods sold.

21. On an interim basis over the next 30 days and on a three month basis, I have prepared a budget for the Debtor setting forth its expected revenues and cash use. A copy of the budget is attached to the DIP Loan/Cash Collateral Motion.

22. I believe that the Debtor's access to sufficient working capital and liquidity through the use of Cash Collateral is necessary to preserve and maintain the going concern value of the Debtor's estate so that the Debtor can maximize the value of its estate. Without the continued use of Cash Collateral the Debtor and its estate would suffer immediate and irreparable harm.

23. The Budget reflects a conservative analysis of the Debtor's income and expenses over the projected periods.

24. In order to provide adequate protection for the Debtor's use of cash collateral to the Lender, to the extent that Lender is properly perfected, the Debtor proposes to provide the Lender with all items set forth in Paragraph 16 (including all subparagraphs) of the DIP Loan/Cash Collateral Motion. A copy of Paragraph 16 is attached hereto as Exhibit A, and incorporated herein by reference.

25. I believe that the forms of adequate protection set forth in Exhibit A are reasonable.

C. *Prepetition Wages and Paycheck Deductions*

26. As of the Petition Date, the Debtor has 45 employees (the "Employees"). In the ordinary course of business, the Employees are paid every two weeks for the preceding two week period. Further, the payroll is staggered so that approximately half of the Employees are paid one week and the remaining Employees are paid the following week. To explain, on March 11, 2011, twenty-three of the Debtor's employees will be owed wages for the period from February 20, 2011 through March 4, 2011. The remaining twenty-two employees will be owed wages on

March 18, 2011 for the period from February 27, 2011 through March 12, 2011. All wages due up to and including March 4, 2011 shall be referred to as the "Wages."

27. It is necessary for the Debtor to compensate the Employees in order to retain their continued and uninterrupted service, which is essential to the Debtor's continued operations.

28. Also in the ordinary course of business, the Debtor deducts from the Employees paychecks, payroll taxes, health care contributions, 401K deductions, and other mandated deductions such as court ordered deductions and loan payments (the "Paycheck Deductions")

29. As of the Petition Date, the Debtor owed its Employees net Wages totaling $21,100 ("Prepetition Wages"). In addition, as of the Petition Date, the Debtor owed approximately $9,100 for the Paycheck Deductions.

30. I believe that any delay in paying Prepetition Wages and Paycheck Deductions will adversely affect Accent's relationship with its Employees, damage morale, and hinder cooperation.

31. Most of Accent's Employees live paycheck to paycheck and rely exclusively on receiving their full compensation and job-related benefits in order to meet their ordinary living expenses. I feel sure that if Employees not paid their Prepetition Wages, they will suffer undue hardship. No amount due to any employee exceeds the statutory priority claim amount for employee wage claims set forth in 11 U.S.C. Sec. 507(a)(4).

32. The preceding statements are true and correct to the best of my knowledge and belief.

_____
Terry Marcovich

Subscribed and sworn to before me this 4th day of March 2011 at Denver, Colorado.

Witness my hand and official seal.

My commission expires: 1/5/14     _____
Notary

[Notary seal: ANGELA R. UPTON, NOTARY PUBLIC, STATE OF COLORADO, MY COMMISSION EXPIRES JANUARY 5, 2014]

16.   In order to provide adequate protection for the Debtor's use of cash collateral to the Secured Creditors, to the extent the Secured Creditors are properly perfected, the Debtor proposes the following:

(a) replacement first priority security interests in and liens and mortgages (collectively, the "**Adequate Protection Liens**") on all of the assets (tangible, intangible, real, personal or mixed) of the Debtor, whether now owned or hereafter acquired, including, without limitation, accounts, documents, inventory, equipment, capital stock in subsidiaries, investment property, instruments, chattel paper, commercial tort claims, cash, cash equivalents, securities accounts, deposit accounts, commodity accounts, real estate, leasehold interests, contracts, patents, copyrights, trademarks, causes of action, and other general intangibles, and all products and proceeds thereof (collectively, the "**Post-Petition Collateral**") subject only to the senior liens to be granted to the DIP Lender pursuant to the DIP Facility, and the lien of Truseal Technologies, Inc. in equipment generally described as a Besten 84" 5 Pair Press (the "**Truseal Lien**") **Loan Agreement, P. 3, ¶4**; and

(b) a superpriority administrative expense claim under section 507(b) of the Bankruptcy Code (the "**Adequate Protection Priority Claim**"), which Adequate Protection Priority Claim shall be senior in priority to any and all claims under sections 503(b) and 507(b) of the Bankruptcy Code, except the priority claims granted to the DIP Lender pursuant to the DIP Facility. **Interim Order, PP. 11-12 ¶13**;

(c) the Adequate Protection Liens and Adequate Protection Priority Claims shall secure the payment of the Prepetition Loan in an amount equal to any and all diminution in the value of the Prepetition Lender's interests in the Prepetition Collateral from and after the Petition Date (the "**Adequate Protection Obligations**") including, without limitation, any such diminution resulting from any of the following: (i) the use by the Debtor of the Prepetition Collateral, including, without limitation, the Cash Collateral, and (ii) the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code.  **Interim Order, P.6 ¶H ii.**

EXHIBIT A

(d) The Adequate Protection Liens shall be subject to the Carve-Out and senior to any other liens on the Post-Petition Collateral except the liens securing the DIP Facility and the Truseal Lien. **Interim Order, P. 10 ¶7.**

(e) On a weekly basis, beginning with the week beginning March 5, 2011, the aggregate actual disbursements specified in the Budget during each such week must be no greater than 105% of the aggregate projected disbursements for such period. If necessary, but not later than two weeks prior to the expiration of the initial Approved Budget Period, the Borrower shall provide to the DIP Lender an updated Operating Budget for any additional period required to effectuate the sale of all or substantially all of the Debtor's assets, in substantially the same format as the previous budget, which upon acceptance by the DIP Lender, shall become the Approved Budget; provided, however, that a new Operating Budget may be effectuated at any time with the consent of the DIP Lender. **Interim Order, PP. 8-9 ¶4.**

(f) In the event the Borrower and the DIP Lender fail to agree upon a new Operating Budget by the end of the then-current Approved Budget, the DIP Facility will terminate upon the expiration of the last Approved Budget. **Interim Order, P. 9 ¶4.**

(g) The Debtor shall provide to the DIP Lender and the Prepetition Lender so as actually to be received on or before 12:00 noon (Eastern time) of each Friday, a weekly line-by-line variance report for the preceding week ending on Saturday, and on a cumulative basis for the period from March 5, 2011 to the last day of such preceding weekly period, which variance reports shall be in form and substance reasonably acceptable to the DIP Lender and the Prepetition Lender comparing actual cash disbursements to amounts projected in the Approved Budget. Failure by the Debtor to comply with the Operating Budget shall constitute a Termination Event (as defined below). The Operating Budget shall not be modified or otherwise amended without the written consent of the Prepetition Lender and the DIP Lender. **Interim Order, P.9 ¶5.**

(h) Upon the Termination Date, and after obtaining relief from this Court from the automatic stay upon hearing and five (5) business days prior notice to

respective counsel to the Debtor, Committee, if any, Prepetition Lender, and U.S. Trustee, the DIP Lender shall be entitled to foreclose or otherwise enforce its security interests in and liens on any or all of the Postpetition Collateral and/or to exercise any other default-related remedies under the DIP Facility Documents, or applicable law in seeking to recover payment of the DIP Obligations.  **Interim Order, P.16 ¶24(a).**

(i) In addition to the Debtor's rights to seek authorization to use the Cash Collateral and/or Postpetition Collateral of the DIP Lender and Prepetition Lender and on a non-consensual basis on and after the Termination Date upon notice and hearing, and the reservation of all rights of the DIP Lender and Prepetition Lender to object to, and contest, such authorization as described above, the parties acknowledge and agree that (x) the only other issue to be determined and decided at such Court hearing is whether the Termination Date has occurred and is continuing and (y) if the DIP Lender is granted such relief from the automatic stay, then the Prepetition Lender will likewise be granted such relief at such time.  **Interim Order, P.16 ¶24(a).**

(j) As used in the Interim Order, the term "**Termination Date**" means the earliest date on which any of the following events:

   i. the date on which the Debtor files a motion with the Bankruptcy Court for authority to proceed with the sale or liquidation of the Borrower (or any material portion of the assets of a Borrower) without the consent of the DIP Lender, and

   ii. the acceleration of the Loan or termination of the commitments under the DIP Facility, including, without limitation, as a result of the occurrence of an Event of Default (as defined below).  **Interim Order, P.16 ¶24(b).**

(k) As used in the Interim Order, the term "**Event of Default**" means:

   i. The Borrower shall fail to make any payment of principal, interest, fees, or other amounts under the DIP Facility when the same becomes due and payable; or

    ii. Any representation or warranty made by the Borrower in the Loan Agreement, the Interim Order or the Final Order, any DIP Facility Document or that is contained in any certificate, document or financial or other statement furnished by it at any time under or in connection with the Loan Agreement or any such other DIP Facility Documents shall prove to have been inaccurate in any material respect on or as of the date made or deemed made or furnished; or

    iii. The Debtor shall breach or violate any term, covenant or agreement contained herein, the Interim Order or the Final Order; or

    iv. Conversion of the Borrower's Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code; or

    v. The appointment of a trustee in the Borrower's Chapter 11 Case without the consent of the DIP Lender; or

    vi. The dismissal of Borrower's Chapter 11 Case; or

    vii. The entry of any order modifying, reversing, revoking, staying, rescinding, vacating or amending the Interim Order or the Final Order without the consent of the DIP Lender; or

    viii. The Interim Order shall not have been replaced by a Final Order acceptable to the DIP Lender in its sole discretion within twenty-five (25) days of the entry of the Interim Order; or

    ix. The Borrower shall have proposed Sale Procedures, as defined in the Loan Agreement, not approved by the DIP Lender; or

    x. The Borrower shall attempt to vacate or modify the Interim Order or the Final Order over the objection of the DIP Lender; or

    xi. The Bankruptcy Court shall enter an order granting relief from the automatic stay to the holder or holders of any other security interest or lien (other than the DIP Lender) in any Postpetition Collateral to permit the pursuit of any judicial or non-judicial

transfer or other remedy against any of the Postpetition Collateral; or

xii. Any provision of the documents relating to the Postpetition Loan shall cease to be valid and binding on the Borrower, or the Borrower shall so assert in any pleading filed in any court; or

xiii. The Debtor shall (i) bring or consent to any motion or application in the Chapter 11 Case to obtain financing from any person other than the DIP Lender under section 364 of the Bankruptcy Code (other than with respect to a financing used, in whole or part, to repay in full in cash all obligations due under the DIP Facility); (ii) grant any lien that is *pari passu* or senior to any lien granted to the DIP Lender under the Interim Order or Final Order, except as permitted therein; or (iii) grant a superpriority claim, other than that granted in the Interim Order or Final Order (and other than with respect to the Carve-Out or adequate protection provided to the Prepetition Lender), which is *pari passu* with or senior to any of the claims of the DIP Lender against the Borrower hereunder; or

xiv. Any other party shall seek and obtain allowance of any order in the Chapter 11 Case to recover from any portions of the Postpetition Collateral any costs or expenses of preserving or disposing of such Postpetition Collateral under section 506(c) of the Bankruptcy Code; or

xv. There shall occur a variance from the Approved Budget in excess of approved variances, unless waived by the DIP Lender; or

xvi. The Borrower shall fail to provide an Budget that is acceptable to DIP Lender in accordance with the terms set forth herein, the Interim Order or the Final Order; or

xvii. Either Borrower or the DIP Lender shall terminate the Asset Purchase Agreement between them; or

xviii. The Bankruptcy Court approves the sale of substantially all of the assets of the Borrower to someone other than the DIP Lender or an affiliate of the DIP Lender. **Interim Order, PP.17-19 ¶24(c).**

(l) Upon the occurrence of a Termination Event, to the extent unencumbered funds are not available to pay in full administrative expenses, the Adequate Protection Claims, the Adequate Protection Liens and the liens securing the Prepetition Loan and the DIP Facility, repayment to the DIP Lender shall be subject to (i) the payment of (a) unpaid professional fees and expenses specified in the Operating Budget that have been incurred as of the date of such Termination Event by professionals retained by the Debtor, any official committee of unsecured creditors (the "**Committee**"), any other statutory committee, trustee, examiner or other representative appointed in the Chapter 11 Case (collectively, the "**Professionals**") net of any unused retainers for such professional fees and expenses, (the "**Professional Fee Carve-Out**"), and (ii) the payment of fees payable pursuant to 28 U.S.C. § 1930 (together with the Professional Fee Carve-Out, the "**Carve-Out**"). Estate professional fees and expenses may be paid only to the extent they are allowed, or as otherwise permitted pursuant to the compensation procedures approved by the Bankruptcy Court. **Interim Order, PP. 19-20 ¶26.**

(m) No portion of the Postpetition Collateral, Prepetition Collateral, the Cash Collateral, or the Carve-Out, and no disbursements set forth in the Budget, shall be used for the payment of professional fees, disbursements, costs or expenses incurred in connection with asserting any claims or causes of action against the Prepetition Lender, including, without limitation, any action challenging or raising any defenses to the Prepetition Loan, or the liens of the Prepetition Lender. **Interim Order, P.20 ¶27.**

## CERTIFICATE OF SERVICE

The undersigned certifies that on March 7, 2011, a copy of the foregoing **AFFIDAVIT OF TERRY MARCOVICH IN SUPPORT OF FIRST DAY MOTIONS** was mailed **VIA FEDERAL EXPRESS OVERNIGHT** in accordance with FED. R. BANKR. P. 2002 and 11 U.S.C. § 342(c) interested parties at the following addresses:

US Trustee
999 18th St
Suite 1551
Denver, CO 80202
*Also via E-mail*

Chase
2371 W 128th Ave
Westminster, CO 80234

Pecos 20, LLC
c/o Basham & Associates
1499 Blake, #1F
Denver, CO 80202

Market Place at Journal Center
Excalibur Asset Management
2301 San Pedro Drive, NE
Albuquerque, NM 87110

PH Tech Corp
144 Ferry Street
Buncher Industrial Park
Leetsdale, PA 15056
Attn: Serge Falardeau

Norm Meier
435 Garfield Street
Denver, CO 80206

Pecos, LLD
c/o Basham & Associates
1499 Blake, #1F
Denver, CO 80202

G&D, LLC
8390 E. Crescent Park, #300
Greenwood Village, CO 80111

Idearc Media Corp., #1223
2200 W Airfield Drive
DFW Airport, TX 75261
Attn: Accounts Receivable

John J. Appelhanz
5960 Monaco Street
Commerce City, CO 80022

Comcast Spotlight
1899 Wyncoop Street, #400
Denver, CO 80202

Customgas Solutions
1750 East club Blvd
Durham, NC 27704

Dex Media East #6252
9501 E Panorama Circle
Englewood, CO 80112

US Building Supply
4391 York Street
Denver, CO 80216
Attn: Cheryl

US Bank
824 North 11th Street
St. Louis, MO 63101-1016

Airgas Intermountain, Inc.
4810 Vasquez Blvd
Denver, CO 80216

BKD, LLP
1700 Lincoln Street
Suite 1400
Denver, CO 80203-4514

KCNC TV
21249 Network Place
Chicago, IL 60673-1249

Minor & Brown, PC
Cherry Creek Plaza, #1100
650 South Cherry Street
Denver, CO 80246
Attn: Tony King

Yellow Book – West
c/o Clovis & Roche, Inc.
4401 N I-10 Service Road West
Suite 200
Metairie, LA 70006

Xcel Energy
414 Nicollet Mall
Minneapolis, MN 55401-1993

PRC-DESOTO International, Inc.
2750 114th Street, #400
Grand Prairie, TX 75050

Glass, Inc.
4005 South Clay Street
Englewood, CO 80110-4373
Attn: Tim Litterest

Edgetech IG, Inc
800 Cochran Ave
Cambridge, OH 43725
Attn: Melissa King

*s/ Angela R. Upton*
Angela R. Upton