UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

IN RE:                                  )
                                        )
ACCENT WINDOWS, INC.,                   )   Case No. 11-14348-SBB
EIN #84-1292301                         )   Chapter 11
                                        )
    Debtor.                             )

**MOTION FOR ORDER AUTHORIZING SALE OF SUBSTANTIALLY ALL OF
DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, AND
ENCUMBRANCES PURSUANT TO OVERBID AND AUCTION PROCEDURES**

The Debtor, Accent Windows, Inc. ("Accent" or "Debtor"), by and through its undersigned counsel and pursuant to Sections 105(a) and 363(b) and (f) of the Bankruptcy Code and Rule 6004(c) of the Federal Rules of Bankruptcy Procedure hereby submits its Motion for Order Authorizing Sale of Substantially All of Debtor's Assets Free and Clear of All Liens, Claims, and Encumbrances Pursuant to Overbid and Auction Procedures, and in support states as follows:

## BACKGROUND AND EVENTS LEADING TO THE CHAPTER 11 FILING

1.     The Debtor filed its Voluntary Petition pursuant to Chapter 11 of the Bankruptcy Code on March 4, 2011, and the Debtor remains a debtor in possession. This is the Debtor's second Chapter 11 bankruptcy case. The Debtor previously filed for relief under Chapter 11 of the Bankruptcy Code on November 4, 2008, and its plan of reorganization was confirmed on September 9, 2009.

2.     Accent Window Products, Inc. was founded in 1982, at which time its primary business was manufacturing storm windows. By the late 1980's, this company was manufacturing vinyl replacement windows, and selling products on a wholesale basis. In 1995, the Debtor entity, Accent Windows, Inc., was formed and sold windows directly to homeowners on a retail basis. In 1997, the two entities merged and Accent Windows, Inc. was the surviving entity. Thereafter, the Debtor terminated its wholesale operation in order to concentrate solely on manufacturing and retail sales.

3.     The Debtor manufactures energy efficient vinyl replacement windows and patio doors manufactured in the Debtor's Westminster, Colorado facility. The Debtor's replacement doors and

windows are sold in Colorado, Arizona, Utah, New Mexico, Texas, Montana, and Wyoming (the "Business").   An overview of the Debtor's business and products may be viewed at www.accentwindows.com.

4.      The Debtor operates out of its leased facility located at 12300 Pecos Street, Westminster, Colorado ("Facility").   The lease ("Lease") was modified during the Original Bankruptcy, and the term of the lease was scheduled to run through January 31, 2014, followed by a five-year option if the Debtor was not in default.  The landlord is Pecos20, LLC ("Landlord").  There is no security deposit.  As of the Petition Date the Debtor was in default of the Lease due to unpaid rent of approximately $111,767.  A forcible entry and detainer action against the Debtor was pending in the Adams County District Court as of the Petition Date.  The Landlord has also filed a Motion for Relief from Stay in the Bankruptcy Court, and seeks possession of the Facility no later than May 31, 2011.  The Debtor is seeking to retain the Facility until approximately August 31, 2011.  In the event that the Debtor and Landlord cannot reach a stipulation to resolve this matter, the Debtor will oppose the Landlord's Motion.

5.      The Debtor also operates a showroom out of a facility located at 7600 Jefferson St. NE, Suite 24 Albuquerque, New Mexico ("NM Facility"), with a lease that expired and is month-to-month (the "NM Lease"). The landlord is Market Place at Journal Center, a New Mexico General Partnership.  As of the Petition Date the Debtor was in default of the NM Lease due to unpaid rent of approximately $5,705. There is a $1,250 security deposit.

6.      While the Debtor was in bankruptcy in 2009, it restructured its operations to attempt to reduce the substantial losses that were occurring.  Employee salaries, including the officers, were reduced by an average of 25%, and the Debtor terminated or renegotiated premise leases and certain contracts which resulted in lower expenses.  The Debtor also revamped its marketing strategy. Although the Debtor suffered average net operating losses between January and May 2009 of $58,000 per month, the Debtor was profitable in June 2009, and projected continued profitability into their strong season. At that time the Debtor believed that the worst of the economic downturn had passed, and that it had created a cost structure and marketing plan that would result in sustained profitability.  However, the economy did not rebound in 2010, the damage to the Debtor's business from competitors using the bankruptcy case to their advantage was substantial, and the Debtor suffered additional losses in 2010.

2

7.     These factors, combined with the undercapitalized nature of the Debtor's balance sheet, have created a business that had substantial debt and insufficient resources to service that debt. There was a continuous and ongoing need for additional cash resources to fund the business operations.

8.     The Debtor and PH Tech, Inc. ("PH Tech") entered into a Note and Security Agreement dated February 25, 2011, pursuant to which PH Tech has loaned the Debtor pre-petition the sum of $15,000 (the "PH Tech Agreement"). The PH Tech Agreement provides PH Tech with security interests in all of the Debtor's assets, including without limitation all of Debtor's right, title and interest in and to all accounts, chattel paper, documents, general intangibles, instruments, goods and money, whether now existing or hereafter created and whether now owned or hereafter acquired, and all proceeds of all of the foregoing.  PH Tech's Security Agreement is secured by a UCC Financing Statement filed with the Colorado Secretary of State, Reception No. 20112009696, on February 28, 2011.  The total amount due to PH Tech as of the Petition Date was $15,000, including interest and principal.

9.     PH Tech is also the Debtor's largest unsecured creditor, and currently holds an unsecured claim in the amount of approximately $776,721.

10.     Pursuant to the PH Tech Agreement, PH Tech holds a first priority lien against the Debtor's assets, except that TruSeal Technologies, Inc. holds a first priority interest in certain equipment financed and used by the Debtor and known as  the Besten 84" 5 Pair Press.  PH Tech holds a junior lien against that same equipment.

11.     In addition to the $15,000 due to PH Tech as of the Petition Date, the Debtor is seeking approval of a debtor-in-possession loan from PH Tech for an amount of up to $135,000 (the "DIP Loan").  Thus far, the Debtor has obtained interim approval to borrow up to $56,250 of the DIP Loan.  As of the date of this Motion, PH Tech has loaned the Debtor the sum of $56,250 post-petition.

12.     Pursuant to a cash collateral stipulation approved by the Court, PH Tech was granted a post-petition replacement lien on assets acquired by the Debtor post-petition to the extent that the Debtor's use of cash collateral results in a decrease in the value of PH Tech's interest in its collateral as such interest existed on the petition date.

3

13.     The total amount of secured debt held by PH Tech as of the date of this Motion is approximately $71,250.  The total amount owed by the Debtor to PH Tech from the DIP Loan and the PH Tech Agreement is due upon closing on the sale of all or substantially all of the Debtor's assets, or May 31, 2011, whichever is earlier.  PH Tech has agreed to extend the maturity of the DIP Loan from the original April 29, 2011 maturity date, to May 31, 2011.

14.     For additional information on the Debtor's background and history, please see Declaration of Terry Marcovich, a copy of which is attached hereto as Exhibit A.

## SALE PROCESS AND ASSET PURCHASE AGREEMENT

15.     The Debtor lacks the resources to continue operating its business, and is dependent upon post-petition loans from PH Tech. PH Tech has made it clear that it will not continue to fund the Debtor beyond May 31, 2011.  If the Debtor were to convert to a Chapter 7 liquidation, its business operations would immediately cease, and an appointed Chapter 7 trustee would likely hire an auctioneer to sell its assets in a piecemeal fashion.  The value of Accent's assets as part of an ongoing business would be eliminated, and Accent believes that there would be no distribution for unsecured creditors.

16.     Accent believes that its current employees are valuable assets to its ongoing operations and any party interested in purchasing its assets.  Accent's current employees have demonstrated their loyalty by remaining with Accent during financially difficult periods, even when their hours and related compensation have been substantially reduced.  Most of Accent's employees have been with Accent for a significant period of time.  All of these employees would be lost in the event this bankruptcy case is converted to a Chapter 7 liquidation.  Losing its employees would cause a substantial loss of value to Accent's assets.

17.     Additionally, the Debtor has been in business since 1992.  Despite the difficulty with generating sales as a result of the bankruptcy case filed in 2008, the Debtor still enjoys an excellent reputation in Denver.  Accent has developed a niche in the window market for product that has very high efficiency ratings.  It manufactures most of its product here in Denver, which helps keep retail prices down.

18.     Rather than converting to a Chapter 7 liquidation, the Debtor believes that through the sale of its Assets as a going concern, it can obtain the highest return possible.  Toward that end Accent has negotiated an Asset Purchase Agreement ("Agreement" or "APA") with PH Tech, Inc. or

4

its assigns (the "Buyer" or "PH Tech") to sell substantially all of its assets (the "Assets").  A copy of the APA is attached hereto as Exhibit B.  Certain of the principal terms of the APA are as follows:

a) The Assets being sold include supplies, inventory, fixtures, furniture, computers and other equipment, licenses, intellectual property, accounts receivable, sales literature, marketing material, and all other tangible and intangible assets, properties, and rights of the Debtor pre-petition and post-petition;

b) The purchase price for the Assets is $600,000.  PH Tech shall be entitled to credit bid the total amount the Debtor owes to PH Tech in connection with the PH Tech Agreement and DIP Loan.  The balance will be paid in cash at closing.

c) The Facility must be vacated, and all of the Assets must be moved to a different location within 90 days of closing. PH Tech shall be responsible for all rental obligations arising under the Lease from the date of closing to the date of surrender of the Facility to the landlord.

d) There are certain adjustments that will be made to the purchase price, including deducting the amount of all customer deposits received by Accent prior to the closing date in connection with customer contracts assumed and assigned to Purchaser at closing, adjustments based on actual inventory on hand as of closing, and adjustments on account of vacation pay obligations assumed by the Purchaser.

e) The Agreement contemplates transferring the Assets free and clear of all liens, claims and encumbrances. The Buyer will not assume any other liabilities or contracts of the Debtor other than as specifically identified in the Agreement.

The Agreement contains many detailed terms and conditions that cannot be included in the body of this Motion.  Interested parties are encouraged to read the Agreement in its entirety for a complete description of all terms of the proposed sale.  A copy of the Agreement is attached hereto as Exhibit B.

19.     The Debtor shall sell the Assets at a sale pursuant to Section 363(b) and (f) of the Bankruptcy Code free and clear of all liens, claims, and encumbrances.

20.     The Agreement was negotiated in good faith and at arms length by the Debtor and PH Tech, and the Debtor believes that the terms of the Agreement, subject to the ability of other parties to submit overbids at an auction, will result in the highest possible value to the estate under the current circumstances.

## ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS

21.     The Debtor is party to certain contracts that PH Tech considers important, though not essential, to the ongoing value of the Debtor's assets:  a) the Debtor's lease for its Facility at 12300 Pecos Street, Westminster, Colorado; b) the Debtor's lease for its NM Facility at 7600 Jefferson St.

5

NE, Suite 24 Albuquerque, New Mexico; and c) the Debtor's Agreement with TruSeal Technologies, Inc. for the financing of equipment known as the Besten 84" 5 Pair Press (the "TruSeal Contract"). The contracts described in subparagraphs a), b), and c) shall be referred to as the "Contracts."

22.     It is contemplated that PH Tech will not take assignment of the Lease of the Facility at 12300 Pecos Street, Westminster, Colorado, and will vacate that leased space within 90 days after closing of the Purchase.  The Debtor will reject that Lease as of the earlier of 90 days after closing, or the date PH Tech vacates the space.  It is contemplated that  PH Tech will attempt to negotiate a new lease agreement with respect to the New Mexico facility.  If new a lease agreement cannot be reached, PH Tech will reject that lease and vacate the New Mexico premises.   Should PH Tech or another Buyer determine that it desires to retain the Debtor's agreement with TruSeal, the Debtor will assume and assign TruSeal Contract.  To accomplish this goal in a fair and expeditious manner, the Debtor proposes that the successful bidder at the Auction notify the Debtor within 7 days after the Auction as to whether it desires the Debtor to assume and assign the TruSeal Contract.

## AUCTION AND OVERBID PROCEDURES

23.     The Debtor filed a Motion for Approval of Procedures for Sale of Assets Free and Clear of All Liens, Claims, and Encumbrances, which has been approved by the Bankruptcy Court. On April 5, 2011, the Court entered its Order Establishing Procedures for Bidding on Sale of All Assets Free and Clear of All Liens, Claims, and Encumbrances (the "Sale Procedures Order").  A copy of the Sale Procedures Order is attached hereto as Exhibit C.

24.     The procedures established by the Sale Procedures Order for competing bids are as follows:

To constitute a Qualified Bid, a bid must satisfy the following requirements:

    (a)     The bid must be in writing and must include an executed definitive asset purchase agreement (the "APA") which shall be on the same terms and conditions in all material respects as those set forth in the Agreement, including payment of a cash component, closing costs, and administrative claims pursuant to Section 364(c).

    (b)     Any bid shall not be conditioned upon the ability of the bidder to obtain financing or the outcome of unperformed due diligence by the bidder.

6

The bid shall have no condition or contingency other than those associated with the assumption and assignment to the successful bidder of specific leases and contracts.

(c)     Any bid must identify those executory contracts and unexpired leases of the Debtor that the bidder will request that the Debtor assume and assign to it.  The successful bidder must negotiate a new contract or pay any and all amounts necessary to cure.

(d)     Any bid must be accompanied by a signed letter directly (i) setting forth the identity of the bidder, the contact information for such bidder, and full disclosure of any affiliates or insiders of the Debtors involved in such bid, (ii) stating that the bidder offers to purchase the Assets upon the terms and conditions set forth in the APA, (iii) summarizing the proposed consideration the bidder proposes to pay under the APA, (iv) stating the bidder's best assessment of the aggregate value of the consideration the bidder proposes to pay under the APA (which statement of value shall not be binding on the Debtors or the Bankruptcy Court), (v) stating the form and amount of any deposit being delivered by such bidder, and (vi) further providing that such offer if determined to be the second highest and best bid shall be binding and irrevocable until 15 days after the auction occurs.

(e)     The bid must be accompanied by a deposit payable to the Debtor's counsel (by means of a certified bank check from a U.S. bank or by wire transfer) in the amount of $50,000, which is to be non-refundable should the bidder be the highest bidder but refuse or fail to proceed to closing.

(f)     Any party submitting a bid must produce adequate documentation (a) to demonstrate such party's wherewithal to consummate the contemplated transaction, and/or (b) to provide adequate assurance of future performance to any parties to any leases or contracts it intends to assume.  Notwithstanding anything in these Bidding Procedures to the contrary, the Debtor may declare that any bid is not a Qualified Bid if the party submitting such bid does not provide documents evidencing such party's wherewithal to consummate the contemplated transaction and/or adequate assurance of future performance.

(g)     Initial incremental overbids shall be in the amount of $50,000 (the "Initial Incremental Overbid Amount") and additional bids will be in the amount of $50,000 each above the previous high incremental overbid (the "Minimum Incremental Bid Amount").

(h)     The Debtor will provide reasonable access to its books and records to interested persons for the purpose of conducting due diligence, provided that any such person provide written evidence acceptable to the Debtor that such Competing Bidder has the present financial ability to consummate the

7

transaction contemplated herein.  All Competing Bidders are deemed to acknowledge that they had an opportunity to inspect the Debtor's Assets and all related documents thereto prior to making any bid and are also deemed to have relied solely on such review and upon their investigation and inspection in making their offers.

(i)      PH Tech shall be entitled to credit bid the total amount of the Debtor's monetary obligation pursuant to the PH Tech Agreement and DIP Loan, and pay the balance of the Purchase Price (as adjusted pursuant to the Agreement) in cash.

(j)      Initial Competing Bids must be Qualified Bids and must be delivered to the Debtor's counsel (the "Bid Deadline") on or before 5:00 P.M., Mountain Standard Time, on Monday, May 2, 2011 ( 16 days prior to the Sale Hearing).  If a Qualified Bid is received by the Bid Deadline, the auction of the Debtor's Assets (the "Auction") shall take place in Courtroom C-402, Byron Rogers Federal Courthouse, 1929 Stout Street, Denver, Colorado May 18, 2011 at 11:30 a..m. or such later time and date (or other place) as the Debtor shall notify all parties who have submitted Qualified Bids.  The following terms shall govern the Auction and the subsequent sale:

          (i)      Only the Qualified Bidders shall be entitled to make any bids at the Auction.

          (ii)      At the commencement of the Auction, the Debtor will announce its determination, in its business judgment, of the highest and best Qualified Bid for the Assets.  Subsequent competing bids must be Qualified Bids (except that they are not required to be in writing) and shall be made in increments of not less than $50,000 in excess of the last submitted, highest Qualified Bid.  Bidding at the Auction will continue until such time as the highest and best Qualified Bid is determined by the Debtor's business judgment.

          (iii)      At the Auction, the Debtor may announce additional procedural rules that are reasonable under the circumstances and not inconsistent with the Bidding Procedures or the Procedures Order

(k)      Once a buyer is determined at the Auction, the Debtor will request the Court enter an order (i) approving (A) the Agreement in the event PH Tech is not overbid, or (B) in the event of a higher bid by a Competing Bidder pursuant to the above-described procedures, the amount of the bid, the form of the contract and the winning bidder, and (ii) authorizing the Debtor to sell the Debtor's Assets to such winning bidder pursuant to the terms of the APA, provided that, in the event the winning bidder pursuant to the above-described bidding procedures is not PH Tech, as consideration for PH Tech's role as the

8

role as the stalking horse bidder, $50,000 of the Initial Incremental Overbid Amount shall be paid to PH Tech (the "Break-up Fee").

(l)     In the event the sale to the winning bidder fails to close, Debtor shall be authorized to sell to the next highest Competing Bidder.

## LEGAL AUTHORITY

### A. The Debtor Meets the Standards for Approval of a Sale of Assets Free and Clear of All Liens, Claims, and Encumbrances

25.     Pursuant to Section 363(f),

The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if:

(1) Applicable nonbankruptcy law would permit a sale of such property free of the interest;
(2) The other entity consents;
(3) The interest is a lien and the sale price is greater than the aggregate value of all liens on such property;
(4) The interest is in bona fide dispute; or
(5) The entity could be compelled in a legal or equitable proceeding to accept a money satisfaction of such interest.

The language of section 363(f) is in the disjunctive, such that the sale free of the interest concerned can occur if any one of the conditions of section 363(f) has been met. *In re Takeout Taxi Holdings, Inc.*, 307 B.R. 525, 529 (Bankr. E.D. Va. 2004). In the case at bar, the Debtor has satisfied Section 363(f)(2)(3) and (5). All of the liens on the Assets are held by the Buyer. The Buyer intends to credit bid the entire amount of the allowed claim that it holds, plus pay the difference in the purchase price in cash to the estate. In the event that the Buyer is not the successful purchaser at any auction of the Assets, the amount of the successful Competing Bid will be sufficient to satisfy the secured claims of the Buyer, in full.

26.     In evaluating a motion to approve a sale of assets, courts consider the "business judgment" test. *In re Lionel*, 722 F.2d 1063 (2nd Cir. 1983). The business judgment standard places the burden on the trustee or debtor-in-possession to establish sound business reasons for the proposed sale. *In re Castre, Inc.*, 312 B.R. 426, 428 (Bankr. Colo. 2004). Courts look at various factors, including whether: a) there is any improper or bad motive; b) the price is fair and the negotiations or bidding occurred at arms-length; and c) there are adequate procedures, including proper exposure to

9

proper exposure to the marketplace. *Id.* In addition to sound business reasons, the Debtor must also demonstrate that there has been adequate and reasonable notice to interested parties, including full disclosure of the terms. Furthermore, the Debtor must show that the sale price is reasonable, and the proposed buyer is proceeding in good faith. *In re Medical Software Solutions*, 286 B.R. 431 (Bankr. D. Utah 2002).

27.     Accent meets these standards. It lacks the resources to continue in business. Without the funds advanced pursuant to the post-petition Lending Agreement between the Debtor and PH Tech, the Debtor's operations would already have ceased. Accent's primary motive in seeking to sell the Assets at this time is to obtain as much revenue as possible for the estate before the value of the Assets has significantly eroded.

28.     The negotiations between PH Tech and Accent have been conducted at arms length. While PH Tech has cooperated with respect to funding pre- and post-petition, it has required the Debtor to abide by a strict budget for use of its funds, and has made it clear that the term for its continued funding is extremely limited.

29.     There will certainly be adequate notice, all creditors and interested parties having already had the opportunity to object to the auction and overbid procedures.

30.     The Debtor believes that the sale price is reasonable under all circumstances, and is in an amount substantially in excess of the amount the Debtor might realize for the Assets in liquidation. Based upon the exposure the Assets have already had to the market, qualified parties will be in a position to overbid and generate funds for unsecured creditors. Moreover, the Debtor believes that PH Tech has proceeded in good faith. PH Tech believes that with a substantial investment of capital, the Debtor's ongoing business can become a profitable operation by sometime in 2012. For all of these reasons, the Debtor believes that the proposed sale of Assets meets the sound business judgment standard.

### B. PH Tech Should Be Afforded the Right to Credit Bid

31.     Section 3 of Section 363(k) of the Bankruptcy Code provides that:

> At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

Since PH Tech holds a lien that secures an allowed claim, pursuant to Section 363(k) it has the right to credit bid the amount of its allowed claim unless the Court orders otherwise.  As of the date of this Motion, PH Tech's secured claim totals approximately $71,250.  However, the amount of PH Tech's secured claim (and thus its credit bid) is expected to increase based upon additional post-petition advances that are contemplated under the terms of the DIP Loan between the Debtor and PH Tech. The Debtor anticipates that the overbid will have to consider PH Tech's credit bid and obligations under the Agreement to total approximately $150,000, which includes PH Tech's pre-petition secured claim of $15,000 and PH Tech's anticipated post-petition loan of $135,000.

32.     The Debtor believes that there is no valid reason to preclude a credit bid.  There is no dispute at this time that PH Tech holds an allowed secured claim.  Section 502(a) provides that, "a claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest . . . objects."  See also, *In re Medical Software Solutions*, 286 B.R. 431 (Bankr. D. Utah 2002).

## MARKETING THE DEBTOR'S ASSETS

33.     The Debtor has already insured that the Assets were marketed effectively.  The Debtor's president, Terry Marcovich, and former vice-president, Andy Klein, contacted approximately 20 parties in an effort to find an investor or purchaser (the "Candidates").  These Candidates were companies that were competitors, brokers, creditors, involved in the energy sector, or venture capital. See Affidavit of Terry Marcovich attached hereto as Exhibit A (the "Marcovich Affidavit").

34.     The Candidates included: Peregrine Mainstream Partners, RavenBrick, Capital Investment Management Company, Brian Clark, Capital Company, LLC, LPL, SDR Ventures, Inc., Dan Siedlecki, Bill Stein, Alternative Business Funding, The Alternative Board, Energized Glass, Nebraska Heavy Industries, U.S. Energy Corp., Ken Stanley, Larry Hoke, U.S. Energy Corp., Accent Contract Glazing, General Capital Partners, Spectrum Commercial, Mike Celmer, Norm Meier, COOL Solar, Integrated Resource Systems, Inc., El Paso Glass, Travis McAfoos, Raindrop Partners SRL, and Gilkey Windows.  See the Marcovich Affidavit.

11

35.     In addition, the Debtor has advertised the sale of assets on the websites of the following trade associations: Plastics News, Door and Window Manufacturer Magazine, Replacement Contractor Magazine.  These trade associations represent virtually all of the window and door companies that sell, manufacture, and/or install windows and doors.

36.     Accent has done everything within reason to market its assets in a comprehensive and professional manner.  See the Marcovich Affidavit.

37.     In addition to creditors, equity holders, entries of appearance, and other parties in interest, the Debtor has sent notice of this Motion to all of the Candidates so that they will have the opportunity to bid on the Assets.

38.     The Debtor believes that it is in the best interests of the Debtor, its estate and its creditors to accept the offer of the Buyer for the purchase of the Assets subject to higher or otherwise better competitive bids.

WHEREFORE, the Debtor requests that this Court enter an Order:

a)  Granting this Sale Motion;

b)  Approving the adequacy and reasonableness of the notice;

c)  Approving the form of Agreement;

d)  Authorizing the Debtor to transfer the Assets to PH Tech, Inc. or the winning bidder, free and clear of all liens, claims, and encumbrances;

e)  Authorizing the Debtor to sell the Assets to the next highest bidder on the terms and conditions set forth in the bidder's offer or the Agreement, in the event that the sale to the winning bidder fails to close;

f)  In the event PH Tech, Inc. is the winning bidder, an order determining that (i) the transaction between the Debtor and PH Tech was made at arms-length, was proposed in good faith consistent with Section 363(m) of the Bankruptcy Code, and represents the highest and best offer for the Assets; and (ii) PH Tech is a good faith purchaser under Section 363(m) of the Bankruptcy Code, and shall be granted all protections afforded thereby;

g)  In the event another bidder is the successful bidder, an order determining that (i) the winning bid was proposed in good faith, and represents the highest and best offer for the Assets and should be approved; and (ii) the winning bidder is a good faith purchaser under Section 363(m) of

12

the Bankruptcy Code, and that the there were no violations of the provisions under Section 363(n); and

h)  For such further relief as to the Court appears proper.

Dated: April 11, 2011                    Respectfully submitted,

By: _____

Jeffrey S. Brinen, #20565
**KUTNER MILLER BRINEN, P.C.**
303 E. 17th Avenue, Suite 500
Denver, CO  80203
Telephone:  (303) 832-2400
Telecopy: (303) 832-1510
E-Mail: jsb@kutnerlaw.com

## CERTIFICATE OF SERVICE

The undersigned certifies that on April 11, 2011, I served by prepaid first class mail or e-mail a copy of the **MOTION FOR ORDER AUTHORIZING SALE OF SUBSTANTIALLY ALL OF DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, AND ENCUMBRANCES PURSUANT TO OVERBIND AND AUCTION PROCEDURES** on all parties against whom relief is sought and those otherwise entitled to service pursuant to the FED. R. BANKR. P. and these L.B.R. at the following addresses:

William G. Horlbeck, Esq.
216 16th St.
Ste. 1210
Denver, CO 80202

Mark Joel Kolber, Esq.
5613 DTC Pkwy.
Ste. 970
Greenwood Village, CO 80111

Ross B. Perkal, Esq.
708 Marquette, NW
Albuquerque, NM 87102

Caroline C. Fuller, Esq.
1700 Lincoln St.
Ste. 2400
Denver, CO 80203-4524

Joseph G. Rosania, Esq.
950 Spruce St.
Suite 1C
Louisville, CO 80027

Alan K. Motes, Esq.
United States Trustee Program
999 18th St., Ste. 1551
Denver, CO 80202

Peregrine Midstream Partners
Attn: Luke Sabin
600 17th Street
Suite 620S
Denver, CO 80202

RavenBrick
Attn: Alex Burney
2201 A Lawrence St.
Denver, CO 80205

Capital Investment Management Comp.
Attn: Ali Yousaf
8055 E Tufts Ave, Suite 1350
Denver, CO 80237

Capital Company, LLC
Attn: Andrew K. Aye
7887 E Belleview Ave, Suite 1100
Englewood, CO 80111

SDR Ventures, Inc.
Attn: Andy Limes
5350 S Roslyn Street, Suite 400
Greenwood Village, CO 80111

Bill Stein
**VIA E-MAIL**
bill@corporatebartersolutions.com

The Alternative Board
Attn: Blair Koch
11031 Sheridan Boulevard
Westminster, CO 80020

Brian Clark
**VIA E-MAIL** brian@allstopgroups.com

Chip Mower
5377 Manhattan Circle, Ste. 203
Boulder CO 80303

Dan Siedlecki
12325 West Bowles Avenue
Littleton, CO 80127-2103

Alternative Business Funding
Attn: Darrick Broen
4100 Albion Street, Ste 765
Denver, CO 80216

Energized Glass
Attn: Dave B. Lundahl
4408 Gray Fox
Fort Collins, CO 80526

Nebraska Heavy Industries
Attn: David M. Hadani
128 N 13th Street, #1100
Lincoln, NE 68508

US Energy Corp
Attn: Hal Herron
877 North 8th West
Riverton, WY 82501

US Bank
Attn: Larry Hoke
950 17 street, 8th Floor
Denver, CO 80202

Accent Contract Glazing
Attn: Marvin Cromwel
224 Unser Blvd NE
Rio Rancho, NM 87122

Spectrum Commercial
Attn: Michael J. Doyle
Two AppleTree Square, Suite 415
Bloomington, MN 55425-1581

Accent Windows & More
Attn: Ken Stanley
4601 N. Blazingstar Tr.
Castle Rock, CO 80109

US Energy Corp
Attn: Mark J. Larsen
877 N 8th West
Riverton, WY 82501

General Capital Partners
Attn: Michael J. Eddy
Republic Plaza
370 17th Street, Suite 5660
Denver, CO 80202

Mike Celmer
**VIA E-MAIL** mcelmer@sswdws.com

Norm Meier
10624 Royal Porthcawl
Naperville, IL 60564

COOL Star
Attn: Richard Roth
2410 30th Street
Boulder, CO 80301

El Paso Glass
Attn: Steve Chestnut
531 E Kiowa St.
Colorado Springs, CO 80903

Raindrop Partners SRL
Attn: Zach Frisch
899 Detroit St
Denver CO 80206

Integrated Resource Systems, Inc.
Attn: Sam Granados
5190 Parfet St.
Wheat Ridge, CO 80033

Travis McAfoos
1366 Clayton Street
Denver, CO 80206

Gilkey Windows
3625 Hauck Road
Cincinnati, OH 45241

*s/ Angela R. Upton*
Angela R. Upton

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Case No. 11-14348- SBB |
| ACCENT WINDOWS, INC. | ) | |
| EIN: 84-1610404 | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |

**DECLARATION OF TERRY MARCOVICH IN SUPPORT OF MOTION FOR ORDER
AUTHORIZING SALE OF SUBSTANTIALLY ALL OF DEBTOR'S ASSETS FREE
AND CLEAR OF ALL LIENS, CLAIMS, AND ENCUMBRANCES PURSUANT TO
OVERBID AND AUCTION PROCEDURES**

I, Terry Marcovich, under penalty of perjury, state as follows:

1. I am the President Accent Windows, Inc., a Colorado corporation ("Accent" or the "Debtor")
   and have been in this position since 2007. I have been employed by Accent for
   approximately 28 years. I am familiar with the day-to-day operations, financial affairs, and
   books and records of Debtor and submit this Declaration in support of Debtor's Motion For
   Order Authorizing Sale of Substantially All of Debtor's Assets Free and Clear of All Liens,
   Claims, and Encumbrances Pursuant to Overbid and Auction Procedures.

2. Along with Accent's former vice-president, Andy Klein, I have mapped out a plan to identify
   parties that might have interest in purchasing, investing in, or merging with Accent. In
   accordance with that Plan, Mr. Klein and I have been contacting potential buyers, investors,
   and merger targets for the past year. We made contact with approximately 30 different
   parties (the "Candidates"). These Candidates were either involved in business in the energy
   sector and related areas, or in the venture capital field.

3. The Candidates included Peregrine Mainstream Partners, RavenBrick, Capital Investment
   Management Company, Brian Clark, Capital Company, LLC, LPL, SDR Ventures, Inc., Dan
   Siedlecki, Bill Stein, Alternative Business Funding, The Alternative Board, Energized Glass,
   Nebraska Heavy Industries, U.S. Energy Corp., Ken Stanley, Larry Hoke, U.S. Energy Corp.,
   Accent Contract Glazing, General Capital Partners, Spectrum Commercial, Mike Celmer,
   Norm Meier, COOL Solar, Integrated Resource Systems, Inc., El Paso Glass, Travis
   McAfoos, Raindrop Partners SRL, and Gilkey Windows. Accent provided financial and
   contractual documents to any interested Candidate, which detailed various information
   regarding Accent's products, plans, and financial information. In addition, all Candidates
   had access to the Plan, Disclosure Statement, and all of the monthly operating reports filed
   by Accent in its prior Chapter 11 case.

4. A number of the Candidates expressed interest in purchasing Accent, in whole or in part.
   The discussions we had with many of the Candidates were ongoing until recently. Accent

**Exhibit A**

had to focus on short-term financing in order to survive, and in that respect worked out a prepetition lending agreement and DIP Loan agreement with PH Tech.

5.  I have also had notice of the sale posted with Plastics News, Door and Window Manufacturer Magazine, Shelter Magazine, Replacement Contractor Magazine, and Window and Door Magazine.

6.  I believe that I have done everything within reason to market Accent's assets in a comprehensive and professional manner. I further believe that we created and executed a well-conceived plan to market Accent's assets, and methodically carried out that plan to the fullest extent possible.

7.  With respect to those parties who expressed any interest in Accent's assets, Accent pursued each and every one of those parties to determine whether further discussions were warranted. After the marketing process had been completed and all interested parties had been pursued to the utmost degree, ultimately, the only offer tendered to Accent came from PH Tech, Inc.

8.  Finally, I do not believe that there are any further actions that Accent could take at this time to market its assets in a way that we have not already performed.

The foregoing Declaration is true and correct to the best of my knowledge and belief.

_____
Terry Marcovich

2

# AMENDED ASSET PURCHASE AGREEMENT

**by and between**

## ACCENT WINDOWS, INC.

**and**

## P.H. TECH INC.

**and**

## THE SHAREHOLDERS OF ACCENT WINDOWS, INC.

**April 6th, 2011**

**AMENDED ASSET PURCHASE AGREEMENT**

THIS AGREEMENT is made and entered into the 6th day of April, 2011, by and among P.H. TECH INC., a Canadian corporation, or its assignee, having its principal office at 8650, boul.de la Rive-Sud, Levis Canada G6V 6N8, or its assigns (hereinafter referred to as "Purchaser"), ACCENT WINDOWS, INC., a Colorado corporation, having its principal office at 12300 Pecos Street, Westminster, Colorado 802341, (hereinafter referred to as "Seller") and the Shareholders of the Seller, all of whom are identified on **Exhibit A** attached hereto (hereinafter referred to as the "Shareholders").

**Exhibit B**

## 1.    **Recitals**.

**1.1**    Seller is engaged in the manufacture and sale of windows in the States of Colorado and New Mexico, and elsewhere in the United States (the "Business").

**1.2**    Purchaser desires to purchase from Seller and Seller desires to sell, transfer, convey and deliver to Purchaser all of the assets of Seller (except as described in section 2.2) including, without limitation, inventory, supplier lists, vendor lists, customer lists, customer contracts, equipment, deposits held by Seller and deposits held by third parties for the benefit of Seller, contracts, accounts receivable, telephone systems, telephone and facsimile numbers, email and website addresses, intellectual property, domain names, patents, patent applications, trademarks, trade names, licenses, leases, furniture, fixtures, equipment, computer hardware, supplies, materials, licenses, trade secrets, and the other personal property and goodwill associated with the Business (hereinafter referred to as "Assets").

**1.3**    All of the issued and outstanding shares of Seller are owned by the Shareholders.

**1.4**    Purchaser is not acquiring any shares of the Seller, rather only the Assets, as hereinabove defined.

**1.5**    Seller filed a voluntary petition under Chapter 11 of the Bankruptcy Code on March 4, 2011 in the United States Bankruptcy Court for the District of Colorado, Case No. 11-14348-SBB (the "Bankruptcy Case").

**1.6**    Seller and Purchase entered into an Asset Purchase Agreement dated as of March 14, 2011 (the "Original APA"). Since the execution of the Original APA, the parties have agreed to certain amendments and modifications to the Original APA, and have agreed to enter into this Amended Asset Purchase Agreement to reflect such amendments and modifications.

**1.7**    As an inducement to Purchaser to purchase the Assets, Seller and the Shareholders are willing to make to Purchaser certain representations and covenants, all of which are contained herein.

**1.8**    The parties hereto desire to set forth herein the terms and provisions of their agreements and understandings.

**1.8**    NOW THEREFORE, for and in consideration of the mutual promises and covenants contained herein and incorporating the above Recitals in the agreements below, it is agreed as follows:

## 2.    **Purchase and Sale of Assets**.

The purchase and sale of the Business and the Assets shall be accomplished as follows:

**2.1    Transfer of Assets**.    Seller agrees to sell the Business and the Assets to Purchaser, subject to the terms and conditions herein set forth, and Purchaser agrees to purchase the Assets from Seller, subject to the terms and conditions herein set forth, at the closing (as

hereinafter defined). Subject to section 2.2, the Assets shall include, without limitation, the following:

    2.1.2    **Intentionally Deleted.**

    **2.1.2** **Tangible Assets**. All of the Seller's tangible assets, including supplies, inventory, fixtures, furniture, computers and other equipment owned by Seller and used in connection with the operation of the Business, including, without limitation, those assets listed in **Exhibit 2.1.2** attached hereto and incorporated herein by this reference (the "Tangible Assets").

    **2.1.3** **Contracts**. All of the Seller's right, title and interest in and to those contracts to be included in the Assignment and Assumption of Contracts to be executed by the parties at closing. The form of the Assignment and Assumption of Contracts is attached as **Exhibit 2.1.3** and incorporated herein. Attached hereto as **Exhibit 6.20** is a list of all contracts presently in effect with Seller. Said exhibit also sets forth with respect to each customer contract the total contract price, the amount of payments already received, the balance due, and if provided in the contract, the date scheduled for delivery and final payment. **Exhibit 6.20** shall be updated as of the closing date. Seller may elect to take assignment of any or all contracts set forth on **Exhibit 6.20**, in its sole and absolute discretion. No later than fifteen days prior to closing, Purchaser shall provide written notice to Seller of those contracts it will assume and thereupon all such assumed contracts shall be listed as the contracts covered by and included in the Assignment and Assumption of Contracts. All other contracts shall be deemed excluded from the Assets.

    **2.1.4** **Books and Records**. All files, books and records of Seller relating to the Assets and the Business generally and all personnel records and other records that Seller is required by law to retain in its possession including any books, records, or files used by Seller in connection with its governmental, tax and other recording and reporting of the conduct of the Business, but, specifically excluding those books and records relating only to the corporate governance of Seller. Said records shall include, without limitation, hard copy or copy stored on computer media, including all customer lists, sales and credit records, service and maintenance histories relating to the Assets, and all records relating to warranties, service agreements or similar agreements relating to the Assets or the Business. Purchaser will upon Seller's request promptly provide (subject to payment by Seller of the reasonable expense thereof), a copy of such books and records as Seller may require for its legitimate business purposes, including the preparation of tax returns. Purchaser will also make such books and records and access to computer hardware and software information available to Seller, upon Seller's reasonable request, if it is necessary for Seller to access such information for other reasonable business purposes including, without limitation, audits by taxing authorities.

    **2.1.5** **Intellectual Property**. All of the Seller's intellectual property including, without limitation, trademarks, trade names, service marks, inventions and proprietary rights, patents and patent applications, phone numbers, facsimile numbers, email and website addresses, computer software used in connection with the Business and the name "Accent Windows, Inc."

    **2.1.6** **Licenses and Permits**. All private and governmental licenses, permits and authorizations relating to the Business, to the extent the Seller has the legal right to transfer such, including without limitation, those listed on **Exhibit 2.1.6.**

       **2.1.7**   **Materials of the Business**.  All brochures, catalogs and materials of the Business including, without limitation, product and sales literature, catalogs, brochures, art work and marketing pieces.

       **2.1.8**   **Accounts Receivable**.  All accounts receivable of Seller.

       **2.1.9**   **Other Assets**.  All other personal property and assets owned by the Seller.

    **2.2**   **Excluded Assets**.  The following assets are excluded from the Assets being sold pursuant to this Agreement: bank accounts, cash (except for cash in an amount equal to the aggregate amount of all deposits and payments received by Seller prior to closing in connection with contracts assumed by Purchaser), certain inventory described in section 3.2, and certain contracts described in section 2.1.3.

    **2.3**   **Taxes**.  Purchaser agrees to pay, at the time of closing, all sales and use taxes arising out of the transfer of the Assets.  In addition, state and local personal property taxes for the Assets transferred hereunder shall be pro-rated as of the closing date.  Purchaser shall not be responsible for any business, occupation, withholding or similar taxes or any taxes of any kind relating to the Assets transferred hereunder with respect to any period ending on or before the closing.

    **2.4**   **Employees**.

       **2.4.1**   **Termination**.   It is contemplated that Seller shall terminate the employment of all of its employees effective at the time of closing.  Purchaser may employ some or all of the individuals employed by Seller in the Business at or after the time of closing on terms satisfactory to Purchaser in its discretion.  Seller and Shareholders acknowledge, however, that said employment may be temporary based upon the needs of the Purchaser.  Any such employees hired by the Purchaser at the time of closing shall be "at will" employees whose employment may be terminated by the Purchaser at any time, with or without cause.  Purchaser shall have no obligation to continue any compensation or benefit programs in place for the benefit of employees of Seller, including, but not limited to, bonus, incentive, pension, profit-sharing, 401(k) and other similar compensation or benefit programs (other than to the extent Purchaser assumes obligations related to vacation pay discussed in Section 2.4.2 below).  Seller will consult with Purchaser with respect to the duties of its employees prior to closing to enable Purchaser to hire those former employees of Seller which in Purchaser's discretion may be necessary for the Business.  Seller and Purchaser will agree on a communication plan to the employees of Seller, prior to the closing and termination of any employees, in order to facilitate a smooth transition in operations from Seller to Purchaser.

       **2.4.2**   **Compensation and Accrued Vacation Pay**.  Seller shall have the obligation to pay and shall be responsible for all compensation due and owing all of its employees through the date of closing and, in addition, except as provided below with respect to vacation pay, shall be responsible for all payroll taxes, vacation pay, bonuses, sick pay, profit sharing, Section 401(k) and fringe benefits applicable to said employees through the date of closing.  With respect to the employees of Seller who are hired by the Purchaser at the time of

closing, a computation shall be made of the amount owing to said employees for accrued vacation pay as of the closing and the same shall be set forth in **Exhibit 2.4.2** to be attached hereto at closing.   Said amount shall be a closing adjustment and the amount of accrued vacation pay assumed by Purchaser shall be applied to and be credited against the payment of the Purchase Price, as such term is defined in section 3 below.

    **2.5**    **Assumed Liabilities**.   Purchaser shall have no responsibility for the payment of any liabilities in connection with the Business except for those expressly assumed by Purchaser in this Agreement.   In addition, Purchaser shall be entitled to a credit against the Purchase Price in the amount of any accrued and unpaid pre-petition liabilities in connection with the Business or the Assets expressly assumed by Purchaser, including any amounts required to cure pre-petition defaults under contracts to be assumed and assigned to Purchaser at closing.

**3.**    **Purchase Price, Adjustments, and Inventory.**

    **3.1**    **Purchase Price**.    The aggregate purchase price ("Purchase Price") for the acquisition of the Assets shall be US$600,000, subject to the adjustments on the date of closing (the "Closing Date") in connection with inventory and equipment on hand as of the closing date, as set forth in Sections 3.2 and 3.3 below.

    **3.2**    **Inventory**.   The Purchase Price is based upon inventory having a book value of US$280,000 at the time of closing.   A physical inventory will be completed at the time of closing by Seller's and Purchaser's representatives.   Any variation in the book value of Seller's inventory as of the Closing Date shall be reflected in a 50 cent adjustment to the Purchase Price for each dollar in variation, either up or down, between the aforementioned $280,000 book value and the actual book value of the inventory as of the Closing Date.   Purchaser shall have the right in its sole discretion to exclude from the Assets included in the Transaction any inventory that in Purchaser's opinion is damaged, defective, obsolete, not suitable for sale in the ordinary course of business or otherwise; and the Purchase Price shall be adjusted in connection therewith as provided above in this section 3.2.

    **3.3**    **Equipment**.   The Purchase Price is based upon all of Seller's equipment as listed in the Valuation Report prepared by Roller Auctioneers, dated September 22, 2010 ("Valuation Report") being transferred and delivered on the Closing Date to Purchaser in good operating condition.   A physical inspection of the equipment will be completed at the time of closing by Seller's and Purchaser's representatives.   The Purchase Price shall be reduced in an amount equal to the sum of:   (i) the aggregate values of any missing equipment as set forth in the Valuation Report, and (ii) the projected cost of any necessary repairs to equipment that is not in good operating condition as of the Closing Date as determined by a knowledgeable third party agreed upon by the parties.   Notwithstanding section 2.1 to the contrary, a certain piece of equipment known as the Besten 84" 5 Pair Press (the "Besten Equipment") is subject to a security interest in favor of TruSeal Technologies, Inc. ("TruSeal") securing indebtedness in the approximate amount of $15,000.   If Seller does not pay the indebtedness secured by such security interest in the Besten Equipment and obtain a UCC termination statement in connection therewith prior to closing, then Purchaser shall have the right to:   (i) exclude such equipment from the Assets; (ii) purchase the Besten Equipment and assume the obligations due to TruSeal, which assumption shall be a credit against the Purchase Price in the amount of indebtedness

assumed; or (iii) purchase the Besten Equipment and direct that a portion of the Purchase Price be dedicated to the payment in full of the indebtedness due to TruSeal at closing.

**3.4    Customer Payments**.  If at closing Seller fails to transfer to Purchaser cash equal to the aggregate of all payments received by Seller through the Closing Date in connection with customer contracts assigned to and assumed by Purchaser in the Assignment and Assumption of Contracts, then Purchaser shall receive a credit against its payment of the Purchase Price in an amount equal to such shortfall.

**3.5    Income Tax Reporting**.  The parties agree that the income tax reporting of this transaction will be prepared consistently with the terms of this Agreement. At the closing, the parties will prepare Internal Revenue Service Form 8594 documenting the allocation of the Purchase Price payable hereunder.  Form 8594 shall be prepared by the parties to take into account the adjustments to the Purchase Price set forth herein.

**4.    Payment of Purchase Price, Allocations, Prorations**.

**4.1    Payment at Closing**.  At closing, Purchaser shall receive a credit for the then-outstanding balance of the $15,000 Loan and the DIP Loan, as described in Section 6.11. In addition, Purchaser shall receive a credit at closing for (a) vacation pay obligations assumed by Purchaser, as set forth in Section 2.4.2, (b) the amount of all customer deposits received by Seller prior to the closing date in connection with customer contracts assumed and assigned to Purchaser at closing; and (c) the amount of any other pre-petition liabilities assumed by Purchaser at closing, including, but not limited to, if applicable, the loan secured by the Besten Equipment, as referenced in Section 3.3, and any cure costs assumed by Purchaser in connection with the assumption and assignment of contracts to Purchaser at closing.   The balance of the Purchase Price for the Assets shall be paid in immediately available funds at the closing.

**4.2    Prorations**.  The following items, if any, shall be prorated to the day of closing: all applicable taxes, utilities, expenses, and license fees, and to the extent expressly assumed by Purchaser, dues, subscriptions, advertising, and communications expenses.

**4.3    Accounts Payable; Collections on Contracts**.  Any and all accounts payable which are not expressly assumed by Purchaser under this Agreement are, and shall remain the sole responsibility of the Seller and are not included as part of this Transaction.  Any and all accounts payable in connection with liabilities expressly assumed by Purchaser under this Agreement, which shall accrue after closing shall be the sole obligations of Purchaser.  If following the Closing Date, Seller receives any payments with respect to any contracts assigned to Purchaser at closing, then such payments shall be deemed to be held by Seller in trust for Purchaser and Seller shall immediately forward such payments to Purchaser.

**5.**      **Closing**.

The closing for this transaction shall occur on or before May 31, 2011, or such earlier time as the parties may mutually agree.  The closing shall take place by delivery of counterpart signature pages by mail or other electronic means.  Seller shall be responsible for all expenses of the Business except those expressly assumed by Purchaser under this Agreement.  The benefits of ownership of the Assets and the Business shall inure to the Purchaser commencing at 12:01 a.m. on the day following closing.  At the closing, the following shall take place:

**5.1**      **Delivery by Purchaser**.  Purchaser shall deliver to Seller the following:

**5.1.1**    The balance of the Purchase Price, after adjustments and credits provided for herein, shall be wire transferred by the Purchaser to the account designated by the Seller.

**5.1.2**    The executed Assignment and Assumption of Contracts.

**5.1.3**    Certified copies of the resolutions adopted by Purchaser's board of directors and stockholders authorizing execution, delivery and performance of this Agreement and the acts of Purchaser's officers in carrying out the terms hereof.

**5.1.4**    All other instruments and documents referred to or contemplated by this Agreement to be delivered by Purchaser.

**5.2**      **Delivery by Seller and Shareholders**.  Seller and Shareholders shall deliver to Purchaser the following:

**5.2.1**    A fully executed Warranty Bill of Sale, in the form attached hereto as **Exhibit 5.2.1,** transferring the Assets to Purchaser free and clear of all liens and encumbrances, except with respect to the Besten Equipment, if Purchaser elects to assume the outstanding secured debt related to the Besten Equipment.

**5.2.2**    The executed Assignment and Assumption of Contracts.

**5.2.3**    An assignment of any other intellectual property of the Business, as described in section 2.1.5, which assignment shall be in form and substance satisfactory to the Purchaser.

**5.2.54** A certificate of Seller certifying that Seller is not a foreign person as that term is used in Section 1445(b)(2) of the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

**5.2.5**    Such additional instruments or documents of transfer that Purchaser deems necessary to vest in it marketable title in and to the Assets free and clear of any security interest, liens, and encumbrances, and as provided for in the court order approving the sale, as described in section 8.13.2.

**5.2.6**    Certified copies of the resolutions adopted by Seller's board of directors

and stockholders authorizing execution, delivery and performance of this Agreement and the acts of Seller's officers in carrying out the terms hereof.

        **5.2.7**   Seller and Shareholders, at any time before or after closing, will execute, acknowledge and deliver any further assurances, documents and instruments of transfer reasonably requested by Purchaser, and will take any other action consistent with the terms of this Agreement that may be reasonably requested by Purchaser for the purpose of assigning, transferring, granting, conveying, and confirming to Purchaser, or reducing to possession, the Assets to be conveyed and transferred pursuant to this Agreement.

    **5.3**   **Closing Settlements**.   In addition to the matters stated elsewhere in this Agreement, the settlement at closing shall include the following matters.  All payables, operating expenses, and other liabilities of Seller through the date of closing are the responsibility of the Seller.  Settlement statements shall reflect the prorations discussed in Section 4.2.  Each party shall pay its respective legal and accounting fees and expenses incurred in connection with the consummation of the Transaction.

**6.**   **Representations and Warranties of Seller and Shareholders**.   Seller and Shareholders hereby jointly and severally make the following representations and warranties, which shall be true as of the date hereof and true as of the closing as if stated again on that date.

    **6.1**   **Recitals**.   The facts stated in the Recitals are true.

    **6.2**   **Title to Assets**.   Seller has, and as of closing will have, good and marketable title to all of the Assets to be sold, transferred and assigned pursuant to this Agreement.  All of the Assets to be sold, transferred and assigned pursuant to this Agreement shall be in good operating condition, ordinary wear and tear excepted.

    **6.3**   **Corporate Status**.   Seller is a corporation duly organized, validly existing, and in good standing under the laws of the State of Colorado, and authorized and entitled to carry on its business in Colorado.  It has no subsidiaries or affiliates.

    **6.4**   **Authority**.   Seller has all requisite power and authority to consummate the transactions contemplated by this Agreement, subject to Bankruptcy Court approval in the Bankruptcy Case.  Seller has by proper corporate proceedings duly authorized the execution and delivery of this Agreement and the consummation of all transactions contemplated herein.

    **6.5**   **Binding Agreement**.   This Agreement is a legal, valid and binding obligation of Seller and Shareholders enforceable in accordance with the terms hereof.  Any and all documents of transfer to be delivered pursuant to the terms hereof by Seller and Shareholders are and will be legal, valid and binding obligations of Seller and Shareholders, enforceable in accordance with the terms thereof.

    **6.6**   **Properties and Licenses**.   All of the Assets are located at the Leased Premises, and are owned free and clear of all security interests, liens, pledges, rights of third parties and encumbrances (except for liens and security interests in favor of Purchaser or an affiliate of Purchaser, and the lien on the Besten Equipment).  Seller has all licenses, permits, operating

authorizations, leases and other agreements necessary to conduct the Business in the manner in which it is conducted. Neither Shareholders nor Seller have received any notice that any of the foregoing are invalid, not in effect or in default, and each and every one of the foregoing shall remain vested in Seller without modification, notwithstanding the Transaction contemplated hereby.

**6.7   No Defaults**.   The execution and delivery of this Agreement and the consummation of the transactions herein contemplated will not conflict with, violate or constitute a default under the articles of incorporation or bylaws of Seller or under any contract, agreement or other instrument, or any order or decree to which Shareholders or Seller are parties or by which they are bound.

**6.8   Litigation**.   Subject to filing the Bankruptcy Case, as described in Section 8.13 hereof, Seller is not party to any suits, actions, proceedings or investigations of any nature pending, or, to the best of Seller's knowledge, is Seller a party to any threatened suits, actions, proceedings or investigations. Seller has not committed any act which to the best of knowledge of Seller or Shareholders would give rise to any legal action or proceeding before any court or administrative agency. There are no outstanding judgments against Seller. As of the date hereof, there has not occurred any event which would give rise to a claim against Seller by any third party.

**6.9   Compliance With Laws**.   To the best of its knowledge, Seller has complied in all material respects with all applicable federal, state, municipal, and other political subdivisions or governmental agency statutes, ordinances, regulations, and other laws which would affect the Assets or the conduct the Business.

**6.10   Financial Statements**.   The financial statements of Seller (including, without limitation, financial statements for the fiscal years ended December 31, 2009, and December 31, 2010), and any additional books, records and documents provided by Seller to Purchaser are substantially true and correct, and fairly present the financial condition of the Business as of the dates thereof and for the periods ended on such dates. There are no material or contingent liabilities of Seller not reflected on such financial statements and, from the date of such financial statements through the closing, there have not, and will not have been, any material change in the Business or material damage or destruction to any of the Assets.

**6.11   Purchaser's Loans to Seller**.   Purchaser has made a pre-petition $15,000.00 loan (the "$15,000 Loan") to Seller secured by a lien on all of Seller's assets for the purpose of funding professionals' fee retainers. Additionally, Purchaser has agreed to provide debtor in possession funding in an amount of $135,000.00 (the "DIP Loan") to the Seller for working capital in the ordinary course of Seller's Business and the payment of professionals' fees through the Closing Date, upon approval of the Court in the Bankruptcy Case to be commenced by Seller. The DIP Loan shall be approved by the Court pursuant to an order containing terms and conditions acceptable to Seller in its sole and absolute discretion, and shall be evidenced and secured by loan documents acceptable to Purchaser in its sole and absolute discretion. The DIP Loan shall be secured by senior a lien on all the assets of the Seller (other than the Besten Equipment), and shall be senior to the lien securing the $15,000 Loan. If the Transaction closes, then at closing Purchaser shall be credited against its payment of the Purchase Price in an amount

equal to the then outstanding balances under the $15,000 Loan and the DIP Loan, including accrued interest.  In the event that the assets are sold to a third party, the $15,000 Loan and the DIP Loan shall be repaid from the sale proceeds at such closing.  In the event that no asset sale is consummated, then Purchaser shall retain its senior liens on the Seller's assets and shall also have an administrative claim in the Bankruptcy Case equal to the outstanding balance under the DIP Loan.

**6.12   Taxes**.  Except to the extent disclosed in the schedules of liabilities filed by Seller in the Bankruptcy Case, as provided for in section 8.13, Seller has duly and timely paid all taxes, assessments, governmental charges and penalties due and payable by Seller.  There are no suits, actions, claims, investigations, inquiries or proceedings pending or, to the best of Seller's knowledge, threatened against Seller in respect of taxes, assessments, governmental charges or penalties.   From the date of execution of this agreement, and through the closing date, Seller will pay all taxes, as they come due, including but not limited to all social security, withholding, sales, personal property and unemployment insurance, and income taxes to all applicable taxing authorities.

**6.13   Regulatory Compliance**.  To the best of its knowledge, the Assets, Business and the Leased Premises are in full compliance with all federal, state and local building, fire, safety, health, and environmental requirements necessary for the existing business operations.  If any expenses are necessary to bring the Assets or Business into compliance with any such governmental requirements, those expenses shall be the sole responsibility of, and will be paid by, the Seller and the Shareholders.

**6.14   Absence of Claims**.  Except as described in **Exhibit 6.14**, no customer of Seller has made claim against Seller, and, to the best of Seller's knowledge, no claims will be made against Purchaser by any customers of Seller relating to actions of Seller prior to closing.

**6.15   Consents**.  Other than the Court, no consent of any federal, state, municipal or other governmental authority, or any third party is required for execution, delivery or performance of this Agreement by Seller.

**6.16   Reports and Returns**.  To the best of its knowledge, any and all reports and returns of any nature required to be filed on behalf of Seller have been duly filed on behalf of Seller not later than the time prescribed by law for the filing thereof (and including extensions thereof) and, except to the extent disclosed in the schedules of liabilities filed by Seller in its Bankruptcy Case, any and all federal, state and local taxes due and payable of Seller have been paid, collected or properly withheld in full.

**6.17   Finders**.  Shareholders and Seller are not parties to, or in any way obligated under, any contract or other agreement, and there are no outstanding claims against Seller for the payment of any broker's or finder's fee in connection with the origin, negotiation, execution, or performance of this Agreement.

**6.18   Employees; Employee Claims**.  Attached hereto as **Exhibit 6.18** is an accurate and complete list of the salaries and other compensation of all employees of Seller who are involved in the Business.  **Exhibit 6.18** includes a summary of all benefits payable to the

employees and a copy of all written employee benefit plans. **Exhibit 6.18** also includes a summary with respect to each employee of the date of employment and a description of each employee's duties and responsibilities with the Seller. There are no material controversies pending or, to the best of Seller's knowledge, threatened between Seller and any of the employees and Seller has not taken nor failed to take any action which would provide a reasonable basis for any such controversy. Seller has complied in all material respects with all laws relating to the employment of labor, including any provisions thereof relating to wages or hours, and, except as disclosed in the schedules filed by Seller in the Bankruptcy Case, Seller is not liable for any arrears of wages or any taxes or penalties for failure to comply with any laws relating to the employment of labor.

      **6.19**   **Leases**. Seller is not a party to any leases pertaining to the Assets or Business, except those scheduled on **Exhibit 6.19** attached hereto. Attached to **Exhibit 6.19** are true, complete and accurate copies of each of the leases related to the Assets or Business. All of said leases are in full force and effect, and valid and binding in accordance with their terms. No party to any lease is in default under the terms of any lease except as disclosed in **Exhibit 6.19**.

      **6.20**   **Contracts**. Attached hereto as **Exhibit 6.20** is a list of all written contracts or agreements to which Seller is a party pertaining to the Assets or Business and a summary of all material oral contracts or agreements to which Seller is party, which list shall be updated at closing.

      **6.21**   **Insurance**. Attached hereto as **Exhibit 6.21** is a current list of all insurance contracts maintained by the Seller including, without limitation, hazard insurance, liability insurance, and health insurance. Said list is true, complete and accurate in all material respects.

      **6.22**   **Real Estate Compliance.** The Leased Premises have been operated by the Seller in accordance with all governmental rules, laws, regulations and administrative pronouncements. To Seller's knowledge, the Leased Premises are in full compliance with all federal, state and local building, fire, safety, health, and environmental requirements applicable thereto. There are no expenses which are currently due or which will arise as the result of the closing under this Agreement which are necessary to bring the Leased Premises into compliance with any such governmental requirements.

      **6.23**   **Representations True and Correct**. No representation, warranty, or covenant by Shareholders and Seller contained in this Agreement, or any document to be delivered hereunder, in connection with the transactions contemplated by this Agreement, will contain any untrue statement of a material fact, or will fail to disclose any material fact.

      **6.24**   **Survival of Representations**. Each representation and warranty contained herein by or on behalf of the Seller and the Shareholders will survive the closing hereunder and shall be deemed restated by the Seller and the Shareholders at the closing, and may be relied upon by Purchaser and shall be enforceable by Purchaser without regard to any investigation made or any information or knowledge of Purchaser with respect thereto.

7.    **Representations and Warranties of Purchaser**.

       Purchaser hereby makes the following representations and warranties, which shall be true as of the date hereof and true as of the closing as if stated again on that date.

       **7.1**    **Recitals**.    The facts stated in the Recitals are true.

       **7.2**    **Corporate Status**.    Purchaser is a corporation duly organized, validly existing, and in good standing under the laws of Canada, and has all requisite corporate power to enter into and perform this Agreement.    On or before the closing date, Purchaser shall be authorized to do business in the State of Colorado.

       **7.3**    **Authority of Purchaser**.    The execution, delivery and performance by Purchaser of this Agreement has been duly authorized by its Board of Directors and no further corporate action is necessary on the part of Purchaser to make this Agreement valid and binding upon Purchaser in accordance with its terms.    Neither the execution, delivery, nor performance by Purchaser of this Agreement will conflict with, or result in, a violation or breach of any terms or provisions of, nor constitute a default under, the articles of incorporation or bylaws of Purchaser, or under any indenture, mortgage, deed of trust, or other contract or agreement to which Purchaser is a party, by which it or its property is bound, or violate any order, writ, injunction, or decree of any court, administrative agency, or governmental body.

       **7.4**    **Compliance with Laws**.    Purchaser is in compliance, in all material respects, with all applicable federal, state, municipal, or other political subdivision or governmental agency statutes, ordinances and regulations, in every applicable jurisdiction, in respect of the ownership of its properties, and the conduct of its business.

       **7.5**    **Finders**.    Purchaser is not a party to, or in any way obligated under, any contract or other agreement, and there are no understandings or claims against Purchaser for the payment of any broker's or finder's fees in connection with the origin, negotiation, execution, or performance of this Agreement.

       **7.6**    **Binding Agreement**.    This Agreement is a legal, valid and binding obligation of Purchaser enforceable in accordance with the terms hereof.    Upon the execution and delivery by Purchaser of the Assignment and Assumption of Contracts and any other documents delivered by Purchaser ("Purchaser's Closing Documents"), each of the Purchaser's Closing Documents will constitute the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with its respective terms.

       **7.7**    **Representations True and Correct**.    No representation, warranty, or covenant by Purchaser contained in this Agreement, or any document to be delivered hereunder, in connection with the transactions contemplated by this Agreement, will contain any untrue statement of a material fact, or will fail to disclose a material fact.

       **7.8**    **Survival of Representations**.    Each representation and warranty contained herein by or on behalf of the Purchaser will survive the closing hereunder and shall be deemed restated by the Purchaser at the closing, and may be relied upon by Seller and shall be enforceable by

Seller without regard to any investigation made or any information or knowledge of Seller with respect thereto.

## 8.    Covenants of Seller and Shareholders.

Seller and Shareholders hereby covenant with Purchaser that, subject to the filing of the Bankruptcy filing and applicable bankruptcy restrictions, that:

**8.1    Operation of Business**.  Through the date of closing, Seller shall operate the Business in conformity with sound business practices, all applicable laws, rules and regulations, and management consistent with those practiced by Seller prior to the execution of this Agreement, and in accordance with the terms of the Court order approving the DIP Loan, and the operating budget incorporated therein.  Seller and Shareholders warrant, represent and covenant that Seller will not take any action or omit to take any action that will have a material adverse effect upon the Assets or the Business and further that Seller will use its best efforts to maintain any goodwill associated with the Assets and the Business.  Seller shall carry on the Business in substantially the same manner as heretofore and not introduce any material new method of management, operation, or accounting.

**8.2    Perform all Material Obligations**.  Seller shall perform and maintain all material obligations of Seller under debt and lease instruments and other agreements relating thereto, and pay all vendors and suppliers in accordance with reasonable business practices.

**8.3    New Obligations**.  Seller shall not enter into new or amended debt or lease obligations, without the prior written consent of Purchaser, it being understood that Purchaser intends to make the DIP Loan to Seller as discussed in paragraph 6.11.

**8.4    Business Relationships**.  Seller shall use reasonable efforts to maintain and preserve intact each business relationship of Seller, retain present employees and maintain relationships with suppliers, customers, and others having business relations with them.

**8.5    Ordinary Course of Business**.  Seller shall not make any expenditures outside the ordinary course of the Business nor shall the Seller take any action outside the ordinary course of the Business, without the prior written consent of Purchaser.  Seller shall not purchase, or commit to purchase, inventory in excess of amounts reasonably needed by Seller to continue to operate in the ordinary course of business through the closing date.

**8.6    Books and Records**.  Seller shall provide Purchaser with reasonable access to the books and records of  Seller for the purpose of conducting such due diligence investigations as Purchaser may reasonably deem appropriate; and

**8.7    Applicable Laws**.  Seller shall fully comply with all applicable laws regarding the sale of the Assets.

**8.8    Further Assurances**.  Seller and Shareholders hereby agree to execute and deliver from time to time at the request of Purchaser and without further consideration, such additional instruments of conveyance and transfer, and to take such other action as Purchaser may

reasonably require to more effectively carry out the provisions of this Agreement.

**8.9**    **Compliance During Agreement**.  Seller shall fully comply with all applicable laws regarding the operation of the Business and shall take no action prior to closing which is inconsistent with the provisions of this Agreement and the obligations of the Seller hereunder.

**8.10**    **Facilities**.    Seller shall maintain its facilities, equipment, and other assets related to the Business in as good working order and condition as of the date of execution of this Agreement, ordinary wear and tear excepted.

**8.11**    **Salaries and Distributions**.    Seller shall maintain the present salaries for all of its employees of the Business and shall not pay any bonuses or other compensation to said employees (except for present salaries) or pay any dividends or other amounts to any Shareholders without the prior written consent of the Purchaser.

**8.12**    **Access**.    Upon mutual execution of this Agreement, in order to enable the Purchaser to perform its due diligence (including environmental investigations), Seller shall provide the Purchaser and its designees with reasonable access to the Leased Premises, its facilities, employees, customers, and the books and records pertaining to the Business. Specifically, and without limiting the foregoing, Purchaser's designees shall have access to the Seller's facilities during business hours in order to enable Purchaser's designees to observe the Seller's operations and systems and to otherwise enable the transition of the Business from the Seller to the Purchaser.

**8.13**    **Bankruptcy Court Approval.**    No later than three (3) business days after execution of this Agreement, the Seller shall file a motion with the Court in the Bankruptcy Case seeking approval of this Agreement (the "**Approval Motion")**, including without limitation the approval of the sale of all of Seller's right, title, and interest in and to the Assets and Business to Purchaser, and a motion to establish procedures for the submission of competing bids, and breakup protection for Purchaser (the "**Sale Procedures Motion")**.  Notice of the Motions shall be served on all and on all creditors and other parties in interest scheduled, or that have entered an appearance, in the Bankruptcy Case.

**8.13.1.**  **Sale Procedures.**  The Sale Procedures Motion shall request that the Court establish sale procedures containing the following general terms and conditions:  (a) Third parties shall be entitled to submit competing bids for the Assets provided that such bids are required to be submitted in writing to the Court, the Seller, and Purchaser on or before the last day to file an objection to the Approval Motion, must be all-cash bids in an amount at least $50,000 in excess of the Purchase Price set forth in this Agreement, must be accompanied by earnest money in an amount of at least $50,000; must contain no material terms or conditions inconsistent with the terms and conditions of this Agreement, and must be accompanied by proof of the party's unrestricted access to funds sufficient to pay the proposed purchase price. (b)  Should any competing bids be submitted for the Assets, an auction of the Assets shall be held in the Bankruptcy Case at hearing on the Approval Motion.  Should Purchaser not submit the highest and best bid for the Assets at hearing on the Approval Motion, Seller shall promptly pay the then outstanding balance of the DIP Loan and the $15,000 Loan from the sale proceeds and shall, in addition, pay Purchaser a breakup fee in the amount of $50,000.

**8.13.2.    Approval Order.**  Seller's right, title, and interest in and to the Assets shall be conveyed to Purchaser free and clear of any and all liens, claims, interests, obligations and encumbrances (**"Encumbrances"**), as provided in the Court Order approving the sale.  The obligation of the parties to consummate this Agreement is expressly conditioned upon entry of an Order of the Bankruptcy Court authorizing the sale of the Seller's right, title, and interest in and to the Assets to Purchaser free and clear of all Encumbrances, and the Order being final (unless such requirement of finality is waived by Purchaser in writing).  The Order shall be in form and substance satisfactory to Purchaser in its reasonable determination and shall specifically provide that the Asset sale hereunder is in good faith pursuant to 11 U.S.C. § 363(m).

## 9.    Conditions Precedent to Obligations of Purchaser.

The obligations of Purchaser under this Agreement are expressly conditioned upon satisfaction of the following conditions, each of which may be waived by the Purchaser in its discretion:

**9.1    Representations and Agreements.**  Purchaser shall not have discovered any material error, misstatement, or omission in the representations and warranties made by Seller and Shareholders in this Agreement.  The representations and warranties made by Seller and Shareholders herein shall be deemed to have been made again at, and as of the time of closing, and shall then be true in all material respects.  Seller and Shareholders shall have performed and complied with all covenants, agreements and conditions required by this Agreement to be performed or complied with by them at or prior to the closing.

**9.2    No Material Change.**  Prior to closing, there shall not have occurred any material adverse change in the condition (financial or otherwise), operations, assets, liabilities, business, or prospects of the Business (other than the Bankruptcy Case).  Seller will carry on its Business and activities diligently and in substantially the same manner as it did prior to the execution of this Agreement.

**9.3    No Damage or Destruction.**  Prior to closing, there shall not have occurred any material damage or destruction (excluding ordinary wear and tear) to any of the Assets or the Leased Premises.

**9.4    Liabilities.**  There shall not have been instituted by any creditors or any third parties any suit or proceeding to restrain or invalidate this transaction or seeking damages from or to impose obligations upon Purchaser on account of this transaction which, in Purchaser's judgment, reasonably exercised, would be materially adverse to Purchaser's interest.  There shall not have been suffered, after the date hereof, any casualty or loss, whether or not covered by insurance, which materially and adversely affects the properties, Assets or Business of Seller.

**9.5    Due Diligence.**  Purchaser shall have until the closing to investigate the Business, Assets, Leased Premises, equipment, contracts and all documents and information presented or compiled in connection therewith and all other matters including environmental investigations that Purchaser may deem appropriate.  Closing under this Agreement shall be conditional upon Purchaser satisfying itself with respect to its said due diligence examination in its sole and

absolute discretion.  If Purchaser is not satisfied with the results of its due diligence investigation, for whatever reason, Purchaser shall give notice thereof to the Seller and the Shareholders and, upon notice, this Agreement shall be deemed to be terminated and all parties shall be relieved of any further obligation hereunder.  If Purchaser fails to give notice of termination on or before the closing, this condition shall be deemed to be waived.

**9.6    Termination of Employment**.  The Seller has discharged its obligation to terminate the employment of all employees as required pursuant to section 2.4.1.

**9.7    Change of Corporate Name**.  On the Closing Date, or in the event closing shall occur on a holiday, Saturday or Sunday, on the first business day following the Closing Date, Seller shall change its corporate name so that the name "Accent Windows, Inc." may be assigned and transferred to the Purchaser.  The change of corporate name and the transfer shall be made in the manner so that the Purchaser may immediately file for the name "Accent Windows, Inc."

**9.8    Short-Term Lease**.  Purchaser shall relocate the Business and Assets within ninety (90) days after Closing.  Seller shall file a motion, simultaneously with filing the motion for approval of this Agreement, to reject the lease of the Leased Premises as of the earlier of ninety (90) days after closing or the date Purchaser vacates the Leased Premises.  Purchaser shall be responsible for all rental obligations arising under the lease from the date of closing to the date of surrender of the Leased Premises to the landlord.   .

**9.9    Court Approval**.  The Court shall have entered appropriate orders approving the Transaction and the Agreement, containing terms and conditions acceptable to Purchaser in its sole and absolute discretion, including terms allowing Purchaser to remain in possession of the Leased Premises for a period of up to ninety (90) days after the closing, and, unless the Court expressly finds the Purchaser is a good faith purchaser pursuant to Section 363(m) of the Code, all appeal periods shall have expired.

**9.10    Closing Date**.  The closing shall occur on or before May 31, 2011.

**10.    Conditions Precedent to Obligations of Seller**.

The obligations of Seller under this Agreement are expressly conditioned upon satisfaction of the following conditions, each of which may be waived by Seller in its discretion.

**10.1    Purchaser's Representations and Warranties True at Closing**.  Seller shall not have discovered any material error, misstatement, or omission in the representations and warranties made by Purchaser in this Agreement.  The representations and warranties made by Purchaser herein shall be deemed to have been made again at and as of the time of closing and shall then be true in all material respects.

**10.2    Purchaser's Performance**.  Purchaser shall have performed and complied with all agreements and conditions required by this Agreement to be performed or complied with it at or prior to the closing.

**11.**   **Nature and Survival of Representations and Warranties**.

   **11.1**   **Nature of Statements**.  All statements contained herein, in any exhibit hereto, or in any certificate or other written instrument delivered by or on behalf of Seller, Shareholders or Purchaser pursuant to this Agreement, or in connection with the transactions contemplated hereby, shall be deemed representations and warranties by Seller, Shareholders, or Purchaser, as the case may be, both as of the date of this Agreement and as of the Closing Date.

   **11.2**   **Survival of Representations, Warranties and Indemnifications**.  Regardless of any investigation at any time made by, or on behalf of, any party hereto or of any information any party may have in respect thereof, all covenants, agreements, representations, warranties and indemnifications made hereunder, or pursuant hereto, or in connection with the transactions contemplated hereby, shall survive the execution of this Agreement and the closing.

**12.**   **Indemnification by Purchaser**.

   **12.1**   **Indemnification**.  The Purchaser shall indemnify and hold harmless Seller and Shareholders and their successors and assigns from and against any losses, damages, or expenses (including reasonable attorney's fees) which are caused by, or arise out of any of the following:

      **12.1.1**   **Performance Default**.  Any material breach or default in the performance by Purchaser of any covenant or agreement of Purchaser contained in this Agreement;

      **12.1.2**   **Representation Default**.  Any material breach of warranty or inaccurate or erroneous representation made by the Purchaser or in this Agreement, in any exhibit attached hereto or in any certificate or other instrument delivered by, or on behalf of, Purchaser or pursuant hereto; and

      **12.1.3**   **Proceedings**.  Any and all actions, suits, proceedings, claims, demands, judgments, costs and expenses (including reasonable legal and accounting fees) as a direct consequence of any of the foregoing; and

      **12.1.4**   **Operations of Business**.  Any liabilities or obligations of Purchaser relating to the activities of the Business which occur after closing and are expressly assumed by Purchaser in this Agreement.

   **12.2**   **Notice and Right to Defend**.  Seller shall promptly notify Purchaser of the existence of any claim or other matter which arises to which the foregoing indemnification obligation would apply, and shall give Purchaser reasonable opportunity to defend the same at its own expense and with counsel of its own selection; provided that Seller shall at all times also have the right to fully participate in the defense at its own expense.  If the Purchaser shall, within a reasonable time, fail to defend, Seller shall have the right, but not the obligation, to undertake the defense, and to compromise or settle the claim or other matter on behalf of, for the account of, and at the risk of the Purchaser.

**13.    Indemnification by Seller and Shareholders**.

**13.1    Indemnification**.    Seller and Shareholders jointly and severally shall defend, indemnify and hold harmless Purchaser and its successors and assigns from and against any losses, damages or expenses (including reasonable attorneys' fees) which are caused by or arise out of any of the following:

**13.1.1    Performance Default**.    Any material breach or default in the performance by Seller or Shareholders of any covenant or agreement of Seller or Shareholders contained in this Agreement;

**13.1.2    Representation Default**.    Any material breach of warranty or inaccurate or erroneous representation made by Seller or Shareholders in this Agreement, in any exhibit or schedule attached hereto or in any certificate or other instrument delivered by, or on behalf of, Seller or Shareholders pursuant hereto;

**13.1.3    Claims.**    Any claims made against Purchaser following the closing with respect to matters pertaining to the Business, the Seller or the Shareholders, unless such liability has been expressly assumed by Purchaser in this Agreement;

**13.1.4    Operations of Business**.    Any liabilities or obligations of Seller or the Business arising prior to closing and any liabilities or obligations of Seller relating to the Assets or the operations of the Business prior to closing; and

**13.1.5    Proceedings**.    Any and all actions, suits, proceedings, claims, demands, judgments, costs and expenses (including reasonable legal and accounting fees) as a direct consequence of any of the foregoing.

**13.2    Notice and Right to Defend**.    Purchaser shall promptly notify Seller and Shareholders of the existence of any claim or other matter which arises to which the foregoing indemnification obligation would apply, and shall give Seller and Shareholders reasonable opportunity to defend the same at their own expense and with counsel of their own selection; provided that Purchaser shall at all times also have the right to fully participate in the defense at its own expense.    If Seller and Shareholders shall, within a reasonable time, fail to defend, Purchaser shall have the right, but not the obligation, to undertake the defense, and to compromise or settle the claim or other matter on behalf of, for the account of, and at the risk of, Seller and Shareholders.

**14.    Notices**.

All notices under this Agreement must be in writing.    Notice shall be deemed delivered and effective three days following posting when mailed, postage prepaid, by registered or certified United States mail, return receipt requested, addressed to the party to be notified or in the case of delivery by reputable overnight delivery service with proof of delivery, shall be deemed delivered and effective upon receipt or refusal to accept delivery.    If delivered in person, notice shall be deemed delivered and effective the date so delivered. For purposes of notice, the addresses of the parties, until changed as hereinafter provided, shall be as follows:

| Purchaser: | P.H. TECH, INC.<br>8650 boul.de la Rive-Sud<br>Levis Canada G6V 6N8<br>Attention: Sarge Falardeau |
| --- | --- |
| With copy to: | Caroline C. Fuller, Esq.<br>Fairfield and Woods, P.C.<br>1700 Lincoln Street, Suite 2400<br>Denver, Colorado   80203-4524 |
| Seller: | ACCENT WINDOWS, INC.<br>12300 Pecos Street<br>Westminster, Colorado 80234<br>Attention:   Terry Marcovich |
| With copy to: | Jeffrey S. Brinen, Esq.<br>Kutner Miller Brinen, P.C.<br>303 E. 17th Avenue, Suite 500<br>Denver, CO   80203 |
| Shareholders: | See attached **Exhibit A** |

Any party, upon notice to the others, may change the address to which further notices shall be sent.

## 15.   **Documents and Instruments**.

The parties agree that they will execute any and all documents and instruments necessary to effectuate and carry out the terms and intent of this Agreement.

## 16.   **Entire Agreement**.

With respect to the transactions described herein, this Agreement, and the exhibits attached hereto, contain the entire agreement between the parties and supersedes all prior agreements, representations, negotiations, statements or proposals related to those matters set forth herein.

## 17.   **Amendment**.

This Agreement may be changed only by an amendment in writing signed by the party against whom enforcement of any such change is sought.

18.    **Binding Agreement and Assignment**.

This Agreement and all the terms and provisions hereof shall be binding upon and inure to the benefit of the parties, their heirs, legal representatives, successors and assigns. Purchaser shall have the right to assign its rights and obligations under this Agreement to an affiliate to be formed.

19.    **Severability**.

If any covenant contained herein, or any part thereof, is hereafter construed to be invalid or unenforceable, the same shall not affect the remaining covenants, which shall be given full effect without regard to the invalid portion; and any court having jurisdiction shall have the power to reduce the duration, area or scope of any such covenant; and in its reduced form, such covenant shall then be enforceable.

20.    **Survival**.

The undertakings, agreements, representations and acknowledgments of the parties contained herein shall survive the closing.

21.    **Specific Performance**.

If any party to this Agreement fails to perform any act required by the terms of this Agreement, then, in addition to all other remedies available at law, the other parties may institute and maintain a proceeding to compel the specific performance of this Agreement by the defaulting party.

22.    **Construction and Interpretation of Terms**.

The titles used in this Agreement are for convenience only and shall not affect the meaning of the terms and provisions of this Agreement. Any words herein used in the singular shall denote the plural as the context so requires and, when used herein in the plural, shall denote the singular as the context so required. Pronouns used herein, whether masculine, feminine or neuter, shall be interpreted as the context so requires.

23.    **Applicable Law**.

This Agreement shall be governed by the laws of the State of Colorado.

24.    **Execution**.

This Agreement may be executed in several counterparts and, as executed, shall constitute one instrument binding on all parties notwithstanding that all of the parties are not signatory to the original or the same counterpart. The parties authorize the execution and delivery of this Agreement by facsimile or email in PDF or similar format.

**PURCHASER:**                              **SELLER:**

P.H. TECH, INC.,
a Canadian corporation

By: _SERGE FALARDEAU_
Title: _PRESIDENT AND CEO_
Facsimile No.: _418- 833- 6847_
Email address: _SFALARDEAU@PHTECH.CA_

ACCENT WINDOWS, INC.,
a Colorado corporation

By: _____
Title: _____
Facsimile No.: _____
Email address: _____

**SHAREHOLDERS:**

_____

_____

**EXHIBIT A
SHAREHOLDERS**

P.H. TECH, INC.,
a Canadian corporation

By: SERGE FALARDEAU
Title: PRESIDENT AND CEO
Facsimile No.: 418- 833 - 6847
Email address: SFALARDEAU@PHTECH.CA

ACCENT WINDOWS, INC.,
a Colorado corporation

By: _____
Title: _____
Facsimile No.: _____
Email address: _____

SHAREHOLDERS:

Shery M. Marcovich

**EXHIBIT A**
**SHAREHOLDERS**

P.H. TECH, INC.,
a Canadian corporation

By: _SERGE FALARDEAU_

Title: _PRESIDENT AND CEO_

Facsimile No.: _418- 833- 6847_

Email address: _SFALARDEAU @PHTECH. CA_


ACCENT WINDOWS, INC.,
a Colorado corporation

By: _TERRY MARCOVICH_

Title: _PRESIDENT_

Facsimile No.: _720-534-2103_

Email address: _Terrym@ACCENTWINDOWS.Com_

**SHAREHOLDERS:**

_____

_____

.....IT \

.AREHOLDERS

**EXHIBIT 2.1.1**
**LEASED PREMISES**

| **Name and Address** | **Address of Leased Premise** |
|---|---|
| G&D, LLC<br>2740 S. Emerson Street<br>Englewood, CO 80113 | 5690 E. County Line Rd.<br>Highlands Ranch, CO |
| Pecos, LLC<br>c/o Basham & Associates<br>1499 Blake, #1F<br>Denver, CO 80202 | 12300 Pecos Street<br>Westminster, CO |
| Market Place at Journal Center, GP<br>PO Box 93172<br>Albuquerque, NM 87119 | 7600 Jefferson Street NE, Suite 24<br>Albuquerque, NM |

**EXHIBIT 2.1.2**
**TANGIBLE ASSETS**

## FURNITURE & FIXTURES

| Asset # | Description | Date of Service | Book Cost |
|---|---|---|---|
| 41 | TELLUS SEC. CREDENZA | 11/25/96 | $ 1,893.84 |
| 53 | NEON SIGNS | 12/1/96 | $ 12,580.00 |
| 61 | CONFERENCE TABLE | 1/14/97 | $ 396.72 |
| 157 | PENTIUM 450 COMPUTER | 7/15/99 | $ 2,729.50 |
| 161 | OKIDATA 395 PRINTER #1 | 2/1/00 | $ 1,500.52 |
| 162 | OKIDATA 395 PRINTER #2 | 6/29/00 | $ 1,500.00 |
| 177 | SIGNTIST QUEBEC SHOWROOM | 12/1/02 | $ 11,927.56 |
| 196 | LOGO SIGNAGE 24 | 5/23/03 | $ 13,047.00 |
| 199 | P4 COMPUTER | 12/4/03 | $ 1,749.32 |
| 202 | TUFF SHED | 12/1/04 | $ 10,850.00 |
| 203 | CHERRY U SHAPED DESK | 2/18/04 | $ 2,000.00 |
| 204 | MAPLE DESK | 2/13/04 | $ 1,500.00 |
| 205 | MAPLE CREDENZA W/HUTCH | 2/13/04 | $ 3,500.00 |
| 206 | TRADE SHOW SIGNAGE | 2/9/04 | $ 1,276.30 |
| 207 | MONUMENT SIGN at STREET | 8/24/04 | $ 3,895.34 |
| 208 | ELEC. SIGN on BUILDING | 8/18/04 | $ 10,988.87 |
| 233 | ENNOVATIONS DATA BASE | 12/31/05 | $ 8,500.00 |
| 235 | P4 COMPUTER XP PRO | 3/31/05 | $ 1,279.52 |
| 236 | SERVER | 5/31/05 | $ 44,384.07 |
| 240 | COMPUTER for ACCT. DEPT | 5/6/05 | $ 6,153.15 |
| 241 | ELEC. PAN CHANNEL SIGN | 3/16/06 | $ 7,986.47 |
| 248 | SQL 25 USERS DOMAIN (GRAYCO) | 2/1/08 | $ 7,768.95 |
| 249 | OKIDATA 395 PRINTER (GRAYCO) | 1/1/08 | $ 1,619.25 |
| 250 | "SIGNIST" SIGN FACING C 470 | 1/1/08 | $ 13,767.41 |
| 251 | SIGNIST | 1/1/03 | $ 13,047.00 |
| 253 | FURNITURE | 1/1/03 | $ 1,638.00 |
| 254 | COMPUTER | 1/1/97 | $ 4,995.00 |
| 256 | DESKS | 1/1/97 | $ 1,114.00 |
| 258 | CREDENZA | 1/1/96 | $ 1,894.00 |
| 264 | EQUIPMENT, FURNITURE ETC. | 1/1/02 | $ 12,337.00 |
| 265 | SIGNAGE | 1/1/02 | $ 6,000.00 |
| 266 | SIGNAGE | 1/1/07 | $ 6,000.00 |
| | **TOTALS** | | $ 219,818.79 |

## TRANSPORTATION EQUIPMENT

| Asset # | Description | Date of Service | Book Cost |
|---------|-------------|-----------------|-----------|
| 243 | 1992 Tractor/Kenworth Semi | 11/15/06 | $19,000 |

|  |  | TOTAL | $19,000 |

## MACHINERY & EQUIPMENT

| Asset # | Description | Date of Service | Book Cost |
|---------|-------------|-----------------|-----------|
| 68 | BERLINEX BX282/BX272 SASH | 5/6/98 | $ 4,737.60 |
| 70 | WEGOMA EMERALD COMPUTER | 4/3/98 | $ 3,570.00 |
| 71 | BESTEN GLASS WASHER | 6/1/98 | $ 46,293.00 |
| 72 | BESTON POWERED CONVEROR | 6/1/98 | $ 18,902.00 |
| 73 | BESTON TILT VACUUM TABLE | 6/1/98 | $ 9,261.00 |
| 74 | BESTON ROLLER PRESS | 8/1/98 | $ 20,549.00 |
| 75 | BESTON CASTER TABLE 4 X 20 | 6/1/98 | $ 3,402.00 |
| 76 | BESTON CASTER TABLE 4 X 15 | 6/1/98 | $ 2,562.00 |
| 77 | BESTON CASTER TABLE 4 X 10 | 6/1/98 | $ 1,702.00 |
| 78 | SOUTHWALL HEAT MIRROR DESP. | 6/1/98 | $ 13,000.00 |
| 79 | CORBETT HEAT SHRINK OVEN | 6/1/98 | $ 25,129.00 |
| 80 | FOREL PIB EXTRUDER | 6/1/98 | $ 28,255.00 |
| 81 | FDR GAS FILLING MACHINE | 6/1/98 | $ 9,030.00 |
| 82 | BERLINEX BX 5650-SP PATIO DOOR | 7/1/98 | $ 1,602.00 |
| 87 | BERLINEX BX 261/260 FRAME | 7/1/98 | $ 4,970.00 |
| 88 | BERLINEX 282/13X272 SASH | 7/1/98 | $ 4,380.00 |
| 107 | ALUMINUM BREAK | 10/31/87 | $ 2,000.00 |
| 111 | AKF - 106 END MILL | 10/22/90 | $ 4,490.00 |
| 114 | ARGON GAS UNIT | 9/1/91 | $ 2,100.00 |
| 117 | COMPUTERIZED GLASS CUT TABLE | 1/31/92 | $ 39,000.00 |
| 118 | COMPUTERIZED GLASS CUT TABLE | 1/31/92 | $ 51,348.00 |
| 123 | 1993 NISSAN P-90 FORKLIFT | 10/4/93 | $ 31,661.16 |
| 124 | GRACO PUMP MODEL 987-786 | 10/7/93 | $ 18,444.00 |
| 126 | ROTEX EPA 378 CORNER CLEANER | 8/1/94 | $ 12,500.00 |
| 127 | ROTEX EPG CORNER WELD TE | 8/1/94 | $ 3,251.05 |
| 128 | COPY ROUTER S/N BF364 | 8/1/94 | $ 4,806.13 |
| 129 | DMS-16 DOUB. MITRE SAW | 8/1/94 | $ 76,200.00 |
| 130 | WELDER FIXTURING FOR BOREAL | 9/1/94 | $ 11,000.00 |
| 131 | COOLING STATION FOR MSE | 9/2/94 | $ 5,000.00 |
| 132 | HOLLINGER 4PT WELDER | 9/2/94 | $ 112,500.00 |
| 133 | BOREAL JIGS & TOOLING | 11/1/94 | $ 17,395.00 |
| 154 | CARDINAL EDGE DELETER | 3/31/98 | $ 3,500.00 |
| 155 | ASSEMBLY SAW XYCOM COMPUTER | 8/1/99 | $ 5,025.00 |
| 156 | SPACER BENDER #O892-1 | 4/1/99 | $ 28,000.00 |
| 164 | OPTISAW TOOLING MAIN FRAME | 12/2/00 | $ 5,040.00 |
| 165 | GLASS CUTTING COMPUTER | 2/1/00 | $ 8,500.00 |
| 166 | AIR COMPRESSOR #660/230 | 6/13/00 | $ 2,625.84 |
| 167 | NAIL FIN OPTI SAW TOOLING | 8/7/00 | $ 5,033.60 |
| 168 | SASH OPTI SAW TOOLING | 7/6/00 | $ 9,064.00 |
| 169 | 4PT. WELDER TOOLING (MAIN) | 12/11/00 | $ 6,451.20 |
| 170 | REBUILT 4PT WELDER | 8/25/00 | $ 88,306.36 |
| 171 | GEN INT. DRUM SANDER | 7/26/01 | $ 1,821.97 |
| 185 | SEALANT EQUIPMENT | 6/1/02 | $ 51,389.00 |
| 186 | PERFECT TECHNOLOGY | 8/14/02 | $ 7,314.51 |
| 187 | AIR COMPRESSOR | 11/25/02 | $ 4,500.00 |
| 188 | PAINT SPRAYER - SHER. WILLIAMS | 11/25/02 | $ 1,800.00 |
| 211 | BESTEN ROLLER PRESS | 12/16/04 | $ 16,694.00 |
| 212 | MUNTIN CRIMPER | 12/7/04 | $ 1,295.00 |
| 213 | ARGON GAS FILLING MACHINE | 7/2/04 | $ 8,800.00 |

| 214 | EDGETECH SUPER SPACER | 7/21/04 | | $ | 3,455.95 |
| 225 | HOT MELT GUN | 1/31/05 | | $ | 2,768.54 |
| 226 | ROTARY SEALING TABLE | 4/1/05 | | $ | 5,921.01 |
| 227 | HOT AIR BENDING SYSTEM | 6/30/05 | | $ | 48,045.03 |
| 228 | AIR COMPRESSOR | 6/30/05 | | $ | 10,927.68 |
| 229 | MOUNTAIN/PLAIN TABLE SAW | 9/9/05 | | $ | 1,989.30 |
| 230 | AIR BENDING SYSTEM PARTS | 6/22/05 | | $ | 1,362.84 |
| 231 | AIR DRYER | 9/26/05 | | $ | 2,871.38 |
| 232 | URBAN MACHINERY | 6/13/05 | | $ | 14,635.86 |
| 242 | 5 X 10 PNEUMATIC TILT TABLE | 1/3/06 | | $ | 5,417.47 |
| 244 | 2K GUNNING SYSTEM | 7/1/08 | | $ | 4,425.95 |
| 245 | URBAN CORNER CLEANER | 1/1/08 | | $ | 136,380.00 |
| 246 | BESTEN TOPPING TABLE | 11/1/08 | | $ | 3,200.00 |
| 247 | BESTEN APPLICATION TABLE | 11/1/08 | | $ | 3,800.00 |
| 263 | BESTEN 84" PAIR PRESS | 1/1/10 | NEW | $ | 17,500.00 |

**TOTAL**     **$  1,100,901.43**

INVENTORY

February 28, 2011

| | |
|---|---|
| FRONT-OF-LINE | 87,651.58 |
| DOCK | 18,163.34 |
| WOOD & ENTRY DOORS | 46,731.27 |
| SCREENS & PATIO DOORS | 21,057.61 |
| PARTS ROOM | 58,481.77 |
| GLASS LINE | 27,934.31 |
| | |
| WORK-IN-PROGRESS | 17,997.64 |
| FINISHED GOODS | 0.00 |

_____

MONTH END TOTAL    278,017.50
                   Cost

**EXHIBIT 2.1.6**
**LICENSES & PERMITS**

| **Name and Address** | **Description of License or Permit** |
|---|---|
| Jim Hall<br>Accent Windows of Utah<br>142 E 360 North<br>Providence, UT 84332 | License Agreement (Utah) |
| Jim Stuckenschneider<br>Accent Windows of Grand Junction<br>520 N Commerce Drive<br>Grand Junction, CO 81505 | License Agreement (Grand Junction) |
| Jim Stuckenschneider<br>Accent Windows of Montana, LLC<br>520 N Commerce Drive<br>Grand Junction, CO 81505 | License Agreement (Montana) |
| Ken Stanley<br>Accent Windows & More<br>4601 N Blazingstar Trail<br>Castle Rock, CO 80109 | Licensee Agreement Southern Colo. |
| Kevin Herron<br>Accent of Northern Colorado<br>14250 W 82nd Ave<br>Arvada, CO 80005 | Licensee Agreement Northern Colo. |

**EXHIBIT 6.19**
**LEASES**

| Name and Address | Description of Lease |
|---|---|
| Penske Truck Leasing<br>Route 10, Green Hills<br>PO Box 563<br>Reading, PA 19603-0563 | Truck Leases:<br>2005 Ford Ranger; 2007 GMC;<br>2 2006 Great Dane 53' Trailers;<br>2008 International |
| Imagistics<br>7442 S Tucson Way<br>Centennial, CO 80112 | Lease on Digital Copier |
| Neopost Leasing<br>PO Box 45822<br>San Francisco, CA 94145-0822 | Equipment Lease |
| Truseal Technologies, Inc.<br>6680 Parkland Blvd<br>Solon, OH 444139 | Equipment Lease |

**EXHIBIT 6.20**
**CONTRACTS**

| **Name and Address** | **Description of Contract** |
|---|---|
| PH Tech<br>144 Ferry Street<br>Leetsdale, PA 15056 | Manufacturing Agent |
| Truseal Technologies, Inc.<br>6680 Parkland Blvd<br>Solon, OH 444139 | Equipment Contract |

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| ACCENT WINDOWS, INC., | ) | Case No. 11-14348- SBB |
| EIN #84-1292301 | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

**ORDER ESTABLISHING PROCEDURES FOR BIDDING ON SALE OF ALL ASSETS
FREE AND CLEAR OF ALL LIENS, CLAIMS, AND ENCUMBRANCES**

THIS MATTER having come before the Court on the Debtor's Motion for Approval of Procedures for Sale of All Assets Free and Clear of All Liens, Claims, and Encumbrances (the "Motion"), there being no objections filed with respect to the Motion, and cause being shown to the Court, it is hereby

ORDERED

THAT the following overbid and auction terms and procedures are hereby approved:

The Debtor and PH Tech, Inc. ("PH Tech") have entered into an Asset Purchase Agreement ("Agreement"), which allows for PH Tech to place a credit bid equal to the amount of its allowed secured claim (the "Credit Bid"). All other bids shall be referred to as "Competing Bids", and the procedures for such bids shall be governed as follows:

To constitute a Qualified Bid, a bid must satisfy the following requirements:

(a) The bid must be in writing and must include an executed definitive asset purchase agreement (the "APA") which shall be on the same terms and conditions in all material respects as those set forth in the Agreement, including payment of a cash component, closing costs, and administrative claims pursuant to Section 364(c).

(b) Any bid shall not be conditioned upon the ability of the bidder to obtain financing or the outcome of unperformed due diligence by the bidder. The bid shall have no condition or contingency other than those associated with the assumption and assignment to the successful bidder of specific leases and contracts.

**Exhibit C**

(c)     Any bid must identify those executory contracts and unexpired leases of the Debtor that the bidder will request that the Debtor assume and assign to it. The successful bidder must negotiate a new contract or pay any and all amounts necessary to cure.

(d)     Any bid must be accompanied by a signed letter directly (i) setting forth the identity of the bidder, the contact information for such bidder, and full disclosure of any affiliates or insiders of the Debtors involved in such bid, (ii) stating that the bidder offers to purchase the Assets upon the terms and conditions set forth in the APA, (iii) summarizing the proposed consideration the bidder proposes to pay under the APA, (iv) stating the bidder's best assessment of the aggregate value of the consideration the bidder proposes to pay under the APA (which statement of value shall not be binding on the Debtors or the Bankruptcy Court), (v) stating the form and amount of any deposit being delivered by such bidder, and (vi) further providing that such offer if determined to be the second highest and best bid shall be binding and irrevocable until 15 days after the auction occurs.

(e)     The bid must be accompanied by a deposit payable to the Debtor's counsel (by means of a certified bank check from a U.S. bank or by wire transfer) in the amount of $50,000, which is to be non-refundable should the bidder be the highest bidder but refuse or fail to proceed to closing.

(f)     Any party submitting a bid must produce adequate documentation (a) to demonstrate such party's wherewithal to consummate the contemplated transaction, and/or (b) to provide adequate assurance of future performance to any parties to any leases or contracts it intends to assume. Notwithstanding anything in these Bidding Procedures to the contrary, the Debtor may declare that any bid is not a Qualified Bid if the party submitting such bid does not provide documents evidencing such party's wherewithal to consummate the contemplated transaction and/or adequate assurance of future performance.

(g)     Initial incremental overbids shall be in the amount of $50,000 (the "Initial Incremental Overbid Amount") and additional bids will be in the amount of $50,000 each above the previous high incremental overbid (the "Minimum Incremental Bid Amount").

(h)     The Debtor will provide reasonable access to its books and records to interested persons for the purpose of conducting due diligence, provided that any such person provide written evidence acceptable to the Debtor that such Competing Bidder has the present financial ability to consummate the transaction contemplated herein. All Competing Bidders are deemed to acknowledge that they had an opportunity to inspect the Debtor's Assets and all related documents thereto prior to making any bid and are also deemed to

have relied solely on such review and upon their investigation and inspection in making their offers.

(i)      PH Tech shall be entitled to credit bid the total amount of the Debtor's monetary obligation pursuant to the PH Tech Agreement and DIP Loan, and pay the balance of the Purchase Price (as adjusted pursuant to the Agreement) in cash.

(j)      Initial Competing Bids must be Qualified Bids and must be delivered to the Debtor's counsel (the "Bid Deadline") on or before 5:00 P.M., Mountain Standard Time, on Monday, May 2, 2011, (16 days prior to the Sale Hearing).  If a Qualified Bid is received by the Bid Deadline, the auction of the Debtor's Assets (the "Auction") shall take place in Courtroom C-402, Byron Rogers Federal Courthouse, 1929 Stout Street, Denver, CO, on Wednesday, May 18, 2011 at 11:30 a.m. or such later time and date (or other place) as the Debtor shall notify all parties who have submitted Qualified Bids. The following terms shall govern the Auction and the subsequent sale:

(i)      Only the Qualified Bidders shall be entitled to make any bids at the Auction.

(ii)      At the commencement of the Auction, the Debtor will announce its determination, in its business judgment, of the highest and best Qualified Bid for the Assets.  Subsequent competing bids must be Qualified Bids (except that they are not required to be in writing) and shall be made in increments of not less than $50,000 in excess of the last submitted, highest Qualified Bid.  Bidding at the Auction will continue until such time as the highest and best Qualified Bid is determined by the Debtor's business judgment.

(iii)      At the Auction, the Debtor may announce additional procedural rules that are reasonable under the circumstances and not inconsistent with the Bidding Procedures or the Procedures Order

(k)      Once a buyer is determined at the Auction, the Debtor will request the Court enter an order (i) approving (A) the Agreement in the event PH Tech is not overbid, or (B) in the event of a higher bid by a Competing Bidder pursuant to the above-described procedures, the amount of the bid, the form of the contract and the winning bidder, and (ii) authorizing the Debtor to sell the Debtor's Assets to such winning bidder pursuant to the terms of the APA, provided that, in the event the winning bidder pursuant to the above-described bidding procedures is not PH Tech, as consideration for PH Tech's role as the stalking horse bidder, $50,000 of the Initial Incremental Overbid Amount shall be paid to PH Tech (the "Break-up Fee").

(l)    In the event the sale to the winning bidder fails to close, Debtor shall be authorized to sell to the next highest Competing Bidder.

Done and entered this  5th  day of April 2011, at Denver, Colorado.

BY THE COURT:

Sid Brooks
_____

Honorable Sidney B. Brooks
United States Bankruptcy Court Judge